Gants, J.
The plaintiff, EIC Development, LLC (“EIC”), owns roughly 167,500 square feet of industrial condominium space within the Everett Industrial Condominiums at 69 Norman Street in Everett (“the Premises”).[1] Through its Second Amended Complaint, EIC has brought a variety of claims against the defendants, all essentially alleging that the defendants are unreasonably thwarting EIC’s efforts to develop the Premises so that the defendant Mystic Valley Development Commission (“MVDC”) can obtain the property through sale or eminent domain on the cheap. The defendants have moved to dismiss all of EIC’s claims except Counts One, Two, Three, and Seven against the MVDC. After hearing and for the reasons stated below, the defendants’ motion to dismiss is allowed in part and denied in part.
THE ALLEGATIONS IN THE COMPLAINT
When evaluating the sufficiency of a complaint pursuant to Mass.RCiv.P. 12(b)(6), the court must accept as true the factual allegations of the complaint and all reasonable inferences favorable to the plaintiffs which can be drawn from those allegations. Fairneny v. Savogran, 422 Mass. 469, 470 (1996); Eyal v. Helen Broadcasting Corp., 411 Mass. 426, 429 (1991). The issue is whether the facts alleged, generously construed in favor of the plaintiffs, state a valid legal claim that would warrant relief on any theory of law. Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 89 (1979). Therefore, the facts described below simply reflect the allegations in the Second Amended Complaint, generously construed in favor of EIC, and should not be seen as findings by the Court.
On August 9, 1996, the Massachusetts Legislature established the MVDC pursuant to Section 11 of Chapter 294 of the Acts of 1996 (“the Enabling Act”) for the purpose of developing “an industrial and office park through the collaboration of government at all levels, public and private institutions of higher education, and private enterprise; which park may include, among other activities, facilities for the carrying on of research and development and production of innovative and advanced communication technologies.” Enabling Act, §11(a). To assist in the development of this industrial and office park, commonly known as “Tele-Com City,” the MVDC was also authorized to eliminate and prevent “the spread of decadent or blighted open areas included within the project area.” Id. Among the actions the MVDC was authorized to take to eliminate urban blight within the project area were “the restoration and renewal of portions of such area by a program of voluntary repair and rehabilitation of buildings or other improvements or by the acquisition by gift, purchase or eminent domain of land and improvements thereon . . .” Id.
TeleCom City is to be built on roughly 200 acres of land in three citiesEverett, Malden, and Medford. The EIC Premises is located in Everett, within the planned area that is to become TeleCom City. EIC entered into a Purchase and Sale Agreement to acquire the EIC Premises in March 1997 (eighteen months after the enactment of the Enabling Act) from the Somerset Savings Bank, but did not close on its purchase until June 30, 1999.
Under the original Master Plan for TeleCom City, adopted by the MVDC and approved by all three cities, the EIC Premises were slated to be taken by eminent domain and demolished. The MVDC retained an appraiser to determine the fair market value of the EIC Premises and, in December 1997, informed EIC that it valued the property at $3 million. Rather than let the eminent domain proceedings take its course, EIC entered into negotiations in February 1998 to sell the Premises to the MVDC and reached an agreement with MVDC’s staff to sell the Premises for $3.6 million. In March 1998, EIC entered into a non-binding Letter of Understanding reflecting the agreement it had reached with MVDC’s staff, but this Letter of Understanding required the approval of the MVDC Board of Directors in order to become effective. Under the Enabling Act, however, any action by the MVDC that *140 applies to one of the three cities within TeleCom City may be vetoed by the mayor of that city, and the City Council of that city has no power to override that veto. Enabling Act at §ll(d)(5)(i). The defendant Mayor of the City of Everett, David Ragucci (“Mayor Ragucci”), threatened to exercise his veto over this sale, so the MVDC Board refused to approve the Letter of Understanding at its meeting in April 1998. At that meeting, Mayor Ragucci, in his dual capacities as Chairman of the MVDC and Mayor of the City of Everett, tabled the proposal to approve the Letter of Understanding, stating that the price was “too high,” and that the MVDC should wait to see if EIC obtained the financing it needed to close on the Purchase and Sale Agreement it had earlier entered into regarding the Premises.
As of April 1998, the EIC had a marketing agreement with the Somerset Savings Bank, who still owned the Premises, to market the Premises for lease by new tenants and to negotiate with existing tenants, and EIC had designated an agent to conduct the marketing and negotiations. EIC’s agent entered into discussions with the Massachusetts Water Resources Authority (“MWRA”) to lease the Premises to the MWRA for a new vehicle maintenance facility. In April 1998, the MWRA notified EIC’s agent that the Premises was one of four sites being considered for its new vehicle maintenance facility, but the MWRA removed the Premises from consideration after Mayor Ragucci sent a letter to the MWRA on May 22, 1998 recommending that it not lease the Premises for this purpose.
In May 1998, EIC entered into discussions with W.K. MacNamara Company (“MacNamara”) regarding its interest in leasing space within the Premises for a construction material recycling facility. However, these discussions led nowhere after Mayor Ragucci told a MacNamara representative that he would not allow any permits to issue from the City of Everett for the EIC Premises because he wanted to “starve EIC out.”
In June 1998, ReHarvest, LLC (“ReHarvest”), a business that recycled surplus food product into animal feed, executed a lease for space in the Premises. ReHarvest’s proposed use of the Premises was allowed as a matter of right under the City of Everett Zoning Ordinance at the time it entered into its lease. In June 1998, Mayor Ragucci told EIC and ReHarvest that he would not support the proposed use of the Premises by ReHarvest and would oppose any use of the Premises that was not contemplated under the MVDC Master Plan. Nonetheless, in November 1998, ReH-arvest obtained a building permit from the City of Everett to commence improvements to the Premises that it planned to occupy.
By March 1999, the City of Everett had enacted a Site Plan Review Ordinance that regulated, among other things, the internal use of vacant space within the EIC Premises. When ReHarvest applied for a new building permit to continue its internal improvements to the Premises, the permit was denied. ReHarvest was told that its planned use of the Premises was now subj ect to the Site Plan Review Ordinance and that site plan approval was now needed for the intended use.
In July 1999, the City of Everett voted to revise its Zoning Ordinances to create a Telecommunications Overlay District, which had the effect of eliminating most industrial uses within the portion of the City of Everett that was part of the TeleCom City Master Plan Area, including the EIC Premises. In September 1999, the City of Everett Planning Board refused to approve ReHarvest’s site plan. The defendant Elizabeth Debski (“Debski”), Everett’s Community Development Director, told EIC that Mayor Ragucci had decided that EIC would receive no permits to use the Premises and no approvals to redevelop the Premises unless it stopped leasing space to ReHarvest. ReHarvest, in a separate action, appealed the City of Everett Planning Board’s rejection of its site plan.
In December 1999, Mayor Ragucci, again in his dual capacities as Chairman of the MVDC and Mayor of the City of Everett, invited EIC to enter into negotiations with the MVDC for a Land Development Agreement and to seek Site Plan Approval from the MVDC so that it could redevelop its Premises. Mayor Ragucci told EIC that the City of Everett would not allow the use or development of the EIC Premises except through the MVDC. He also told EIC that, if the ReHarvest suit against the City of Everett “went away,” he would instruct the MVDC to give EIC site plan approval for redevelopment of the EIC Premises and enter into a Payment In Lieu Of Taxes agreement (“PILOT Agreement”) to reduce the real estate taxes assessed against the EIC Premises in future years. He also said he would deliver to EIC a tenant (RCN) willing to occupy 10,000 square feet of office space in the EIC Premises. In March 2000, EIC signed a Letter of Intent with the MVDC for a Land Development Agreement memorializing, among others, these provisions. The Letter of Intent was signed by Mayor Ragucci in his capacity as Chairman of the MVDC. EIC contends that it was forced to agree to many provisions in the Letter of Intent that were inappropriate, unlawful, and beyond the authority of the MVDC because of the refusal of the City of Everett to allow pre-existing nonconforming uses of its property and Mayor Ragucci’s unfettered power to veto under the Enabling Act.
In March 2000, EIC began the site plan review process as required under the TeleCom Land Use Regulations for the construction of a two-stoiy building with 260,000 square feet of office, research and development, and manufacturing space within the original footprint of the EIC Premises (“the EIC Plan”). In May 2000, the MVDC voted to grant Conditional Site Plan Approval for the EIC Plan. In June 2000, however, the MVDC reneged on the commitments it made in the Conditional Site Plan Approval and demanded changes to the EIC Plan that would reduce *141 the value of EIC’s Plan and benefit a competing development in the MVDC project area in which the MVDC had a ten percent equitable stake. Among the changes in the Plan that the MVDC demanded were:
the taking of land in which EIC had an interest without fair compensation;
leaving this land vacant until the time of the taking;
one, rather than two, curb cuts for the proposed building;
the rental of space in the building to the MVDC at a low, fixed rental rate, with the MVDC permitted to sublet this space at a higher rental rate; and
limits on parking spaces, the number of employees, and traffic trip generation that would restrict the use of the new building.
Mayor Ragucci told EIC that, unless it executed a Land Development Agreement with all these changes, the City of Everett Building Department would issue no permits for the EIC Plan.
EIC substantially modified its plan to accommodate the MVDC’s demands. On August 7, 2000, the MVDC voted to grant a Final Conditional Site Plan Approval for the EIC Premises based on a revised Plan that contemplated a three-stoiy building to be built on a smaller footprint (“the Revised EIC Plan”). The Final Conditional Site Plan Approval was “conditional” only as to items that needed to be accomplished in order to obtain a building permit; as to all other matters, it was final. In December 2000, four complete sets of the Revised EIC Plan were sent to the MVDC to be stamped as “approved,” so that EIC could obtain a building permit and commence construction. In January 2001, the MVDC refused to stamp the Revised EIC Plan as “approved” and continues to refuse to this day, thereby effectively denying EIC the opportuniiy to obtain the necessary building permit.
Meanwhile, beginning in 2000 and continuing until April 2001, the MVDC and EIC also negotiated the terms of a Land Development Agreement. Since the telecommunications market deteriorated in December 2000, the MVDC agreed to EIC’s request to permit pre-existing industrial uses of the EIC Premises until the improvement in the telecommunications market warranted upgrading the Premises for telecommunications use. In return for allowing pre-existing industrial uses of the Premises on an interim basis, the MVDC required EIC to pay property taxes to the City of Everett at above-market value and to withdraw its pending requests for tax abatements. Pursuant to this agreement regarding interim use, EIC met with Debski, defendant Peter Hollands (Project Director of MVDC’s TeleCom City), and defendant Stephen Wishoski (an employee of the Malden Redevelopment Authority and an agent of the MVDC) on February 28, 2001 regarding EIC’s desire to lease space to Raytheon Corporation for a pre-existing industrial use. Debski, representing the City of Everett, said the City had no objection to this leasehold, and Wishoski said the MVDC had no objection. In reliance on these representations, EIC allowed Raytheon to occupy a portion of the Premises on April 27, 2001.
In March 2001, EIC and the MVDC reached agreement on all major substantive issues regarding the Land Development Agreement. Under the terms of the LDA, EIC was to enter into a PILOT agreement under which its property taxes would be reduced from roughly $150,000 per year, payable to the City of Everett, to $50,000 per year, payable to the MVDC. On March 19, 2001, the MVDC voted to approve the Interim Use Plan and the final PILOT schedule, and also voted to authorize its Chairman to execute the Land Development Agreement with EIC on behalf of the MVDC, subject to resolution at the staff level of the remaining minor issues. EIC and the MVDC staff soon reached agreement as to all these minor issues. Yet, at its April 23, 2001 meeting, the MVDC Board, at the request of Mayor Ragucci, by a unanimous vote decided not to execute the Land Development Agreement.
Even though the City of Everett and MVDC had earlier expressed no objection to the occupancy of the EIC Premises by Raytheon, in June 2001 the City of Everett Building Inspector, Michael Desmond, at the request of Debski and Hollands, applied for a criminal complaint on behalf of the City of Everett against EIC for alleged zoning violations resulting from the Ray-theon occupancy. That criminal complaint was issued on October 30, 2001 against Essex Capital Partners Inc. and its president, Robert Grant. As a result of the application for a criminal complaint, Raytheon has refused to execute a lease with EIC to remain on the Premises.
EIC has brought ten causes of action, five for declaratory judgment and five for money damages. Counts One through Five seek a declaratory judgment that:
1. the Final Conditional Site Plan Approval on August 7,2000 constituted a site plan approval that is binding on the MVDC and the City of Everett;
2. the Land Development Agreement is binding on the MVDC;
3. the MVDC had requested linkage payments from EIC that were not authorized by the Enabling Act because no linkage study had been performed, as is required under the Enabling Act;
4. the veto power given to the Mayors of Everett, Malden, and Medford in the Enabling Act is null and void under Massachusetts law; and
5. the Telecommunications Overlay District enacted in July 1999 by the Cfiy of Everett constituted “spot zoning” intended to prevent the non-telecommunications use of the EIC Premises by ReHarvest, the MWRA, and MacNamara.
*142 Counts Six through Ten seek money damages based on:
6. the unlawful interference with EIC’s contractual and advantageous relations with its lessees and prospective lessees by the MVDC, Mayor Ragucci, Wishoski, Hollands, and Debski;
7. the MVDC’s breach of contract regarding the Land Development Agreement and the earlier Letter of Intent;
8. MVDC’s unfair and deceptive acts and practices, in violation of G.L.c. 93A, §11;
9. the constructive taking of the EIC Premises by the MVDC and the City of Everett; and
10. violation of the Massachusetts Public Records Act, G.L.c. 66, § 10(b), by the MVDC and the City of Everett.
The MVDC, while denying the allegations as to all claims, seeks dismissal only of Counts Four, Six, Eight, Nine, and Ten. The City of Everett seeks dismissal of all the counts directed against itCounts Five, Nine, and Ten. The individual defendantsMayor Ragucci, Hollands, Debski, and Wishoskiseek dismissal of the one count against themCount Six. This Court will first address the motion to dismiss brought by the MVDC.
DISCUSSION
1. The MVDC’s Motion to Dismiss
A. Count Four: The Mayoral Veto Power under the Enabling Act
In Count Four, EIC essentially asks this Court to declare unlawful the provisions in the Enabling Act that grant the mayors of Everett, Medford, and Malden “absolute veto power over any action by the [MVDC] as that action applies to that city, the city council of that city having no power to override such veto.” Enabling Act at §11(5)(i). Under the Enabling Act, the veto by the mayor must be exercised within thirty days of the MVDC having taken an action applicable to that mayor’s particular city. Id.
Although paragraph 64 of the Second Amended Complaint alleges, “on information and belief,” that Mayor Ragucci on April 23, 2001 vetoed the MVDC’s decision to enter into the Land Development Agreement, the MVDC’s minutes of the April 23, 2001 Executive Session of the MVDC make it plain that there was no veto. Rather, those minutes reflect that Hollands asked the MVDC to consider reaffirming the Chairperson’s discretion to execute a “nearly complete” Land Development Agreement with EIC containing certain provisions and, upon a motion by Mayor Ragucci, the Executive Session members voted unanimously to table the matter until the next meeting. These minutes, being public records, may be considered by the Court, along with the pleadings, in deciding a motion to dismiss. See Watterson v. Page, 987 F.2d 1 (1st Cir. 1993) (permitting “official public records” to be considered in motion to dismiss); Schaer v. Brandeis University, 432 Mass. 474, 477 (2000), quoting 5A C.A. Wright & A.R. Miller, Federal Practice & Procedure, §1357 at 299 (1990) (permitting “matters of public record” to be considered in motion to dismiss). Indeed, although paragraph 64 alleges that Mayor Ragucci “vetoed the LDA,” the previous sentence of the paragraph makes it plain that no veto could have occurred, because it alleges that, “at its April 23, 2001 meeting, the MVDC, at the request of defendant Mayor Ragucci, decided that it would not proceed to enter into the LDA on the terms authorized by its previous vote and agreed to by EIC, notwithstanding the resolution of all minor and non-substantive issues.” Therefore, even viewing these allegations generously, as I must on a motion to dismiss, the most that EIC alleges is that Mayor Ragucci induced the MVDC not to enter into the LDA by threatening to exercise his veto if it did.
The Supreme Judicial Court declared in Massachusetts Ass’n of Indep. Ins. Agents & Brokers, Inc. v. Commissioner of Ins.:
In order for a court to entertain a petition for declaratory relief, an “actual controversy” sufficient to withstand a motion to dismiss must appear on the pleadings. G.L.c. 231A, §1. Even if there is an actual controversy, the particular plaintiff must demonstrate the requisite legal standing to secure its resolution . . . The question whether an actual controversy exists is closely related to the issue of standing. . .
The purpose of both the actual controversy and the standing requirements is to ensure the effectuation of the statutory purpose of G.L.c. 231A, which is to enable a court “to afford relief from. .. uncertainty and insecurity with respect to rights, duties, status and other legal relations.” G.L.c. 231A, §9, inserted by St. 1945, c. 582, §1. Such proceedings are concerned with the resolution of real, not hypothetical, controversies; the declaration issued is intended to have an immediate impact on the rights of the parties . . .
Although the “actual controversy” and standing requirements should be liberally construed in accord with the provisions of G.L.c. 231A, §9, there are limits to the matters which can be heard in an action for a declaratory judgment... In the sense that the matter at issue here involves a dispute over an official interpretation of a statute and the validity of a regulation promulgated pursuant to that interpretation, a justiciable controversy exists... G.L.c. 231A, §2. However, controversy in the abstract is not sufficient to allow a plaintiff to invoke the declaratory judgment remedy... The plaintiff must also be one who, by virtue of a legally cognizable injury, is a person entitled to initiate judicial resolution of the controversy . . .
A party has standing when it can allege an injury within the area of concern of the statute or regula *143 tory scheme under which the injurious action has occurred.
373 Mass. 290, 292-293 (1977) (non-statutory citations omitted).
Applying these principles, this Court finds that EIC does not have standing to challenge the legality of the Enabling Act’s veto provisions. Certainly, EIC would have standing to challenge a substantive decision of the MVDC that affected its ability to develop its Premises, because such a decision is “within the area of concern” of the Enabling Act regarding the development of the TeleCom City area. See Villages Development Co. v. Secretary of the Executive Office of Environmental Affairs, 410 Mass. 100, 106 (1991) (properly owner has standing to seek declaratory relief when “the use of his property is prevented or impaired by an administrative decision which the owner maintains is valid”); Benevolent & Protective Order of Elks, Lodge No. 65 v. Planning Bd. of Lawrence, 403 Mass. 531, 546 (1988). If the seven-member Board of the MVDC had indeed voted to take an action affecting the development of EIC’s property and Mayor Ragucci had vetoed that action, then EIC may have standing to challenge the procedural provision that grants the Mayor this veto. But when no veto is exercised by the Mayor, a legal challenge to the right of the Mayor to exercise that veto power becomes purely a “controversy in the abstract.” Massachusetts Ass’n of Indep. Ins. Agents & Brokers, Inc. v. Commissioner of Ins, 373 Mass. at 292-93.
Nor does that controversy become less abstract because the existence of the mayoral veto power shifts the balance of power at the MVDC with respect to actions within a city in favor of the mayor of that city. In enacting the Enabling Act creating the MVDC, it was plainly the Legislature’s intent to protect each participating city from actions being taken by the MVDC without the consent of its mayor. The mayoral veto is only one manifestation of that intent. The Board that governs the MVDC consists of seven membersthe mayor of each of the three participating cities, a designee appointed by each of the three mayors, and the governor or his designee. Enabling Act at § 11(d). “[N]o action taken by the [MVDC] shall be binding on any participating city unless all commission members representing such city vote to approve such action as it applies to such city.” Enabling Act at §ll(d)(5))(ii). Therefore, not only can the mayor veto any action taken by the MVDC that applies to his city, but no action is binding on his city unless he and his designee vote to approve it. Consequently, even if this Court were to give the EIC standing to challenge the lawfulness of the mayoral veto under the Enabling Act, and find that veto authority to be unlawful, the approval of the LDA by the MVDC Board would still not make the LDA binding on the City of Everett if Mayor Ragucci or his designee on the Board were to vote against approval of the LDA. As a result, judicial determination of the lawfulness of the mayoral veto would not accomplish the statutory purpose of G.L.c. 231A “to afford relief from . . . uncertainty and insecurity with respect to rights, duties, status and other legal relations.” It would not reinstate any MVDC decision because the LDA was never approved by the Board and Mayor Ragucci’s designee (Debski) voted with the others to table it.
In short, while the lawfulness of the legislative grant of such veto power may indeed be an interesting legal issue, EIC does not have standing to cause this Court to decide this abstract issue when (1) the veto has not been exercised in a manner adverse to EIC’s property interests and (2) resolution of this issue will not even necessarily resolve the fundamental issue of whether Mayor Ragucci can effectively prevent the MVDC from taking any action he disagrees with within Everett’s portion of TeleCom City. Therefore, the MVDC’s motion to dismiss Court Four because of EIC’s lack of standing is ALLOWED.
B. Count Six: Intentional Interference with Contractual and Advantageous Relations
The MVDC contends that, as a public employer, it is immune from liability for intentional torts, including the tort of intentional interference with contractual and advantageous relations, under the Massachusetts Tort Claims Act, G.L.c. 258, §10(c) (“the Tort Claims Act”). Indeed, Section 10(c) specifically declares that this particular intentional tort claim is not among the claims for which public employers are liable under the Act. The issue, then, is whether the MVDC falls within the definition of a “public employer” under the Tort Claims Act, because, if it does, then the Act has not abrogated the MVDC’s sovereign immunity with respect to these intentional tort claims.
Under G.L.c. 258, §1, “public employer” means “the commonwealth and any county, city, town, educational collaborative, or district, including any... commission, . . . institution, agency or authority thereof which exercises direction and control over the public employee, but not. . . the Massachusetts Bay Transportation Authority, the Massachusetts Port Authority, the Massachusetts Turnpike Authority, or any other independent body politic and corporate.” The Supreme Judicial Court in Lafayette Place Associates v. Boston Redevelopment Authority struggled with the problem of determining the meaning of an “independent body politic and corporate” in deciding whether to affirm a verdict against the Boston Redevelopment Authority (“BRA”) for, among other claims, intentional interference with contractual relations. 427 Mass. 509 (1998). Ultimately, the Court determined that the BRA was not an “independent body politic and corporate,” largely on the pragmatic ground of “making the c. 258 regime as comprehensive as possible, thus avoiding introducing the ‘crazy quilt’ of immunities . . . which the Act was meant to replace.” Id. at 532 (citation omitted). This Court, based on the reasoning offered *144 by the Supreme Judicial Court in Lafayette Place Associates, finds that the MVDC, like the BRA, is not an “independent body politic and corporate.”
Fairness dictates, however, that this Court confront one potentially significant difference between the BRA and the MVDC. The BRA’s Enabling Act, like the MVDC’s, provides that the BRA shall be “liable ... in tort in the same manner as a private corporation.” G.L.c. 121B, §13 (BRA Enabling Act). Compare with MVDC Enabling Act at § 11(h)(1) (‘The commission shall be liable in contract or in tort in the same manner as a private corporation”). The difference is that the BRA Enabling Act was enacted before the Massachusetts Tort Claim Act was enacted in 1978, while the MVDC Enabling Act was enacted in 1996, long after the Tort Claims Act became law. The Supreme Judicial Court in Lafayette Place Associates concluded that the Legislature did not intend, in drafting the language under G.L.c. 258, §10 that declared that the earlier provisions of the Tort Claims Act did not apply to claims alleging intentional torts, to leave development and housing authorities whose Enabling Acts contained this or similar language exposed to intentional tort claims. 427 Mass. at 534-35. The Court declared, “Such a reading would be so manifestly against the intention of the Legislature to introduce a uniform regime of tort liability for public bodies ... that a mere drafting infelicity will not lead us to adopt it.” Id. This Court finds that the Supreme Judicial Court would come to the same conclusion with an Enabling Act provision that was enacted after the Tort Claims Act, like the MVDC’s, that ostensibly would resurrect the MVDC’s liability for intentional tort claims and eliminate the immunity it otherwise would have enjoyed under the Tort Claims Act. This Court will not read this relatively routine Enabling Act provision to reflect the Legislature’s intent to exclude the MVDC from “the uniform regime of tort liability for public bodies.” Therefore, the MVDC’s motion to dismiss Count Six against it is ALLOWED.
C. Count Eight: The Chapter 93A Claim
In Lafayette Place Associates, the Supreme Judicial Court observed that it “has repeatedly held that c. 93A does not apply to parties motivated by ‘legislative mandate, not business or personal reasons.’ ” 427 Mass. at 535, quoting Peabody N.E., Inc. v. Marshfield, 426 Mass. 436, 439-40 (1998), which quoted Poznik v. Medical Professional Ins. Ass’n, 417 Mass. 48, 52 (1994). The Court recognized that “ [i]t is perfectly possible for a governmental entity to engage in dishonest or unscrupulous behavior as it pursues its legislatively mandated ends,” but such unfair and deceptive behavior does not render the governmental entity liable under c. 93A. Lafayette Place Associates, 427 Mass. at 535. The Supreme Judicial Court also acknowledged that it had not yet “addressed the question whether a public entity is ever a proper defendant in a c. 93A action," id. at 536, and this Court is not aware of any subsequent Supreme Judicial Court decision in which it did address that precise question.
In the absence of any definitive ruling by the Supreme Judicial Court as to whether a public entity can ever be liable under c. 93A, the MVDC, to prevail at the motion to dismiss stage, must establish beyond a doubt that the EIC can prove no set of facts that would permit a reasonable factfinder to conclude that the MVDC was motivated by business or personal reasons rather than legislative mandate. See Nader v. Citron, 372 Mass. 96, 98 (1977). While this burden is formidable, it is not inevitably insurmountable: the Massachusetts Medical Professional Insurance Association prevailed on its motion to dismiss a c.93A claim on similar grounds, and that dismissal was affirmed by the Supreme Judicial Court. Poznik v. Medical Professional Ins. Ass’n, 417 Mass. at 50-53.
This Court concludes that, while the Second Amended Complaint asserts that the MVDC acted towards the EIC “(i]n its private corporate role as a developer, broker, [and] land owner,” Second Amended Complaint at 4, the specific allegations in the Complaint, even if proven, would not permit the conclusion that the MVDC was motivated by anything other than its legislative mandate. The MVDC’s legislative mandate was to develop TeleCom City, to eliminate and prevent the spread of decadent and blighted areas, and to use its authority to acquire property either through purchase or its eminent domain power to accomplish these objectives. See Enabling Act at § 11(a). The Complaint alleges that the MVDC acted essentially:
to harass EIC in order to induce EIC either to sell its property to the MVDC for a lower price or to reduce its fair market value in an eminent domain proceeding;
to prevent EIC from using its Premises in a manner deemed inconsistent with the goals of TeleCom City; and
to protect the public fisc of the City of Everett, both by increasing its property tax assessments on the Premises and to reduce its liability in a pending court proceeding.
The MVDC’s conduct, as alleged, may indeed have been dishonest or unscrupulous, but there is nothing to support the inference that it was motivated by anything other than legislatively mandated ends. See Lafayette Place Associates, 427 Mass. at 535. In short, when a development agency, like the MVDC, engages in development, its unfair and deceptive behavior does not render it liable under c. 93A. Lafayette Place Associates, 427 Mass. at 535. The MVDC’s motion to dismiss the c. 93A claim alleged in Count Eight, therefore, is ALLOWED.
D. Count Nine: Constructive Taking
EIC’s claim of a constructive taking in Count Nine, as EIC makes clear in its brief, is essentially a claim *145 for inverse condemnation under G.L.c. 79, §10.[2] Under that provision:
When the real estate of any person has been taken for the public use or has been damaged by the construction, maintenance, operation, alteration, repair or discontinuance of a public improvement . . . , but such taking was not effected by or in accordance with a formal vote or order of the board of officers of a body politic or corporate duly authorized by law, .. . and by such taking, damage, entry, seizure, destruction or use he has suffered an injury for which he is entitled to compensation, the damages therefor may be recovered under this chapter.
G.L.c. 79, §10. While the statute speaks of a physical invasion, a taking compensable under §10 may still occur when a city or public agency regulates properly in such a way as to deprive an owner “of virtually all of that owner’s interest in the property affected.’’ Municipal Light Co. of Ashburnham v. Commonwealth, 34 Mass.App.Ct. 162, 169 (1993). See Wilson v. Commonwealth, 31 Mass.App.Ct. 757, 764 (taking may still occur in absence of physical invasion if state’s regulation of property denies owner “economically viable use of his land”), affirmed on this ground (but reversed and remanded on other grounds), 413 Mass. 352 (1992). See also Palazzolo v. Rhode Island, 533 U.S. 606, 630 (2001) (no taking when parcel retains $200,000 in development value under wetland regulations, which constitutes more than “a token interest”).
The Supreme Judicial Court “has repeatedly recognized that government regulations ‘may deprive an owner of a beneficial property useeven the most beneficial such usewithout rendering the regulation an unconstitutional taking.’ ” Daddario v. Cape Cod Commission, 425 Mass. 411, 416-17 (1997), quoting Moskow v. Commissioner of Envtl. Mgt., 384 Mass. 530, 533 (1981), which quotes Lovequist v. Conservation Comm'n of Dennis, 379 Mass. 7, 19 (1979). “That an alternative, permissible use might be less profitable is not determinative.” Daddario v. Cape Cod Commission, 425 Mass. at 417.
Here, accepting all EIC’s allegations as true, EIC has essentially alleged that the MVDC and City of Everett have wrongfully deprived EIC of its right to use its Premises in accordance with pre-existing nonconforming uses; it has not alleged that it has been deprived of all use of the Premises. Indeed, it is plain that, under the City of Everett’s Revised Zoning Ordinance creating a Telecommunications Overlay District (Section 24 (4.0) of the Telecommunications Amendment), the Premises, like all property within the Telecommunications Overlay District, may be used as of right for nine separate categories of commercial and industrial uses, including telecommunications facilities and infrastructure, research and development, retail sales and services, and financial institutions. EIC has not alleged that the use of its Premises for these permitted purposes would be futile or economically impracticable. Therefore, EIC is not truly alleging that the MVDC and City of Everett, by their regulation of the Premises, have stripped the Premises of virtually all of its economic value as an income-producing property; rather, it is alleging that the MVDC and City of Everett have effectively prohibited all present use of the Premises consistent with prior non-conforming uses. This regulatory conduct may itself be subject to judicial review if contrary to the City of Everett Revised Zoning Ordinance or the Enabling Act, but it cannot constitute a compensable taking under §10 or under the United States or Massachusetts Constitutions.[3]
Perhaps recognizing this flaw, EIC bases its constructive taking claim primarily on its allegations that the defendants have intentionally harassed EIC and frustrated every attempt it has made to lease its Premises for economic gain in order to depress the value of the property so that it may obtain the Premises through eminent domain at a substantially reduced price. This Court acknowledges that these allegations may be considered in any judicial review of the zoning or agency decision that has been misused to accomplish this forbidden purpose. These allegations may also be considered once the government actually condemns the property and commences eminent domain proceedings. In such an eminent domain proceeding, the landowner is entitled to just compensation for his land equal to its fair market value, defined as the highest price that a hypothetical willing buyer would pay to a hypothetical willing seller in a free and open market. See Correia v. New Bedford Redevelopment Authority, 375 Mass. 360, 361 (1978). When there is proof that the government has intentionally taken actions for the specific purpose of depressing the fair market value of the property, the landowner may be entitled to a jury instruction that the value of the property must be determined without regard to any zoning restrictions or other government decisions that were designed specifically to depress the value of the property. See Business Ventures, Inc. v. Iowa City, 234 N.W.2d 376 (Iowa Supreme Ct. 1975); People Dept. Pub. Wks. v. Southern Pac. Trans. Co., 33 Cal.App.3d 960 (Cal.Ct.App. 1973). Through this instruction, the government would be denied the fruits of its abuse of authority, because fair market value would be determined without regard to the efforts it made to depress that valuation.
These allegations, however, may not form the basis for a constructive taking claim where the challenged regulatory actions have not stripped the properly of virtually all of its economic value. In short, these allegations, by themselves, do not constitute a separate and distinct basis for a constructive taking claim. If they did, any claim that a governmental entity abused its legitimate authority for the specific purpose of depressing the value of a property to obtain it more *146 cheaply through eminent domain would permit a plaintiff to bring a constructive taking for the reduction in the fair market value of his property, whatever the magnitude of that reduction.[4]
Therefore, since EIC does not allege that the defendants’ actions have stripped the Premises of virtually all of its economic value and since the allegations that the defendants abused their authority for the specific purpose of reducing the fair market value of the Premises does not, alone, state a constructive taking claim, the MVDC’s motion to dismiss the constructive taking claim must be ALLOWED. For the same reasons, the City of Everett’s motion to dismiss this claim must also be ALLOWED.
E. Count Ten: Violation of the Massachusetts Public Records Act
In its Second Amended Complaint, EIC alleges that the MVDC and the City of Everett violated the Massachusetts Public Records Act, G.L.c. 66, §10(b), by failing timely to provide the public records it requested in a letter dated August 28, 2001 from its prior attorney. After the Second Amended Complaint was filed, both the MVDC and the City of Everett responded in writing to this public records request and both now contend that this claim has been rendered moot by these responses. EIC contends that its claim is not moot both because the disclosure has been incomplete and because the copying amount charged by the MVDC and the City is above the “reasonable fee” permitted under G.L.c. 66, §10(a) of the Public Records Act. Since there appear to be factual issues still in dispute as to this claim (albeit issues peripheral to those that go to the merits of this lawsuit), the motion brought by the MVDC and the City of Everett to dismiss Count Ten must be DENIED.
2. The City of Everett’s Motion to Dismiss
As noted earlier, the City of Everett has moved to dismiss all the counts directed against itCounts Five, Nine, and Ten. This Court, in resolving MVDC’s motion to dismiss, has already allowed the City’s motion to dismiss Count Nine and denied its motion to dismiss Count Ten. Consequently, all that remains for consideration is the City’s motion to dismiss Count Five, alleging that the Telecommunications Overlay District enacted in July 1999 by the City constituted forbidden “spot zoning” intended to prevent the non-telecommunications use of the EIC Premises by ReHarvest, the MWRA, and MacNamara.
A. Count Five: Spot Zoning
“Spot zoning occurs when there is a ‘singling out of one lot for different treatment from that accorded to similar surrounding land indistinguishable from it in character, all for the economic benefit of the owner of that lot.’ ” Rando v. Town of North Attleborough, 44 Mass.App.Ct. 603, 606 (1998), quoting Whittemore v. Building Inspector of Falmouth, 313 Mass. 248, 249 (1943). Spot zoning is forbidden for two reasons: it violates the requirement in G.L.c. 40A, §4 that “(a]ny zoning ordinance or Bylaw which divides cities and towns into districts shall be uniform within the district for each class or kind of structures or uses permitted,” and it constitutes a denial of equal protection under the law, as guaranteed by both the United States and Massachusetts Constitutions. Rando v. Town of North Attleborough, 44 Mass.App.Ct. at 606.
While EIC’s Second Amended Complaint alleges that the City of Everett’s Revised Zoning Ordinance creating a Telecommunications Overlay District (Section 24(4.0) of the Telecommunications Amendment) violated the prohibition against spot zoning, it is plain from the terms of that Zoning Ordinance that it did not single out the EIC Premises for different treatment from that accorded to adjacent land. Rather, the same restrictions were imposed on all property within the boundaries of the Telecommunications Overlay District, which constituted far more property than the EIC Premises. Therefore, from the terms of that Zoning Ordinance, it is plain that EIC cannot state a claim for “spot zoning.”
Perhaps because this is so plain, EIC attempts in its opposition to the motion to dismiss to recharacterize its claim as one alleging illegal contract zoning. “Illegal contract zoning is said to involve the process by which a local government enters into an agreement with a developer whereby the government extracts a performance or promise from the developer in exchange for its agreement to rezone the property; . . . [and] ... ‘is disapproved of largely on the basis of the principle that a municipality may not contract away its police power to regulate on behalf of the general welfare.’ ” Id. at 607, quoting Bobrowski, Massachusetts Land Use and Planning Law§3.4.4 (1993), which quotes from 1A Rathkopf, Zoning and Planning §§29A-25 and 29A-27 (4th ed. 1982). A claim of illegal contract zoning, however, is made by a third party complaining that a local government gave a developer zoning relief in return for something of value. Here, EIC (the developer) is complaining that the City of Everett has demanded things of value in return for zoning relief. Essentially, EIC, while alleging spot zoning in Count Five and then characterizing its claim as illegal contract zoning in defending Count Five, is not truly alleging either types of illegality; it is alleging something akin to extortion. If EIC wants to make such an allegation, it can move to once again amend its complaint,[5] but it cannot justly bring such an allegation within the rubric of a spot zoning claim. Therefore, the City of Everett’s motion to dismiss Count Five is ALLOWED.
3. The Individual Defendants’ Motion to Dismiss
As noted earlier, the individual defendantsMayor Ragucci, Hollands, Debski, and Wishoskiseek dismissal of the one count against them, Count Six, alleging intentional interference with EIC’s contrac *147 tual and advantageous relations with its lessees and prospective lessees.
This Court has already found that the MVDC is within the definition of a “public employer” under the Tort Claims Act, as is the City of Everett. As noted earlier, intentional torts, including the tort of intentional interference with contractual and advantageous relations, are specifically excluded from coverage under the Tort Claims Act, G.L.c. 258, §10(c), so the individual defendants would remain personally liable for any damages awarded on this claim. The individual defendants contend that they are entitled to absolute immunity from personal liability under Section 11(h)(1) of the Enabling Act, which provides:
The members, employees, officers and agents of the [MVDC] shall not be liable as such on contracts or for torts not committed or directly authorized by them nor shall said members be liable for any negligent or wrongful act or omission for which the [MVDC] would be liable under applicable rules of law, in which event any action either civil or criminal against the [MVDC] shall be the exclusive remedy for any injured party.
This Court finds that this provision does not confer absolute immunity on any of the individual defendants from the allegations made in Count Six, because that count alleges that they committed or directly authorized the intentional interference, and the MVDC would not be liable for their intentional conduct under the Tort Claims Act.
The individual defendants also contend that Count Six must be dismissed as to them because the conduct they allegedly committed is protected by the doctrine of qualified immunity. Under this doctrine, public officials are “shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). For these individual defendants to be individually liable for intentional interference with contractual or advantageous relations, this Court “must determine whether an alleged right was established with sufficient particularity that a reasonable official could anticipate that his actions would violate that right.” Borucki v. Ryan, 827 F.2d 836, 838 (1st Cir. 1987), citing Anderson v. Creighton, 483 U.S. 635, 639-40 (1987). “[I]n assessing a claim of qualified immunity, it is not sufficient for a court to ascertain in a general sense that the alleged right existed . . .” Borucki v. Ryan, 827 F.2d at 838. “[W]hile the right allegedly violated may have been clear in general outline, it may have been unclear how that right would be balanced against competing rights or interests.” Id. In determining whether an alleged statutory or constitutional right was clearly established, this Court must apply a “wholly objective standard,” since the focus is on what a reasonable person would have known, not the state of mind of the individual public official. Mathews v. Rakiey, 38 Mass.App.Ct. 490, 495 (1995). In essence, a public official cannot be found personally liable for tortious conduct committed in his official capacity unless a reasonable person in the defendant’s position would have known that his conduct violated a clearly established right. If a reasonable person would not have known that his conduct violated a clearly established right, it does not matter whether the defendant acted with a benign or malicious intent; the defendant still enjoys qualified immunity.
More commonly, the question of whether a public official’s conduct is shielded by qualified immunity arises when the public official is accused of having violated the civil rights of another. In these civil rights cases, the court’s resolution of the qualified immunity issue rests on whether the public official’s conduct plainly violated a clearly established constitutional or statutory right of the plaintiff. Here, however, the question of qualified immunity arises because the defendant public officials are accused of committing the tort of intentional interference with contractual or advantageous relations. A defendant, regardless of whether or not he is a public official, commits this tort when the defendant knows that the plaintiff has a contract or advantageous business relationship with a third pariy, and intentionally interferes with this contract or advantageous relationship “through improper motive or means,” thereby causing financial loss to the plaintiff. Adcom Products, Inc. v. Konica Business Machines USA, Inc., 41 Mass.App.Ct. 101, 104 (1995), rev. denied, 423 Mass. 1111 (1996). See also United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 815-16 (1990).
The improper motive required is actual malice"a spiteful, malignant purpose, unrelated to the legitimate corporate interest." King v. Driscoll, 418 Mass. 576, 587 (1994), quoting Wright v. Shriners Hospital for Crippled Children, 412 Mass. 469, 476 (1992), which quotes Sereni v. Star Sportswear Mfg. Corp., 24 Mass.App.Ct. 428, 433. See also Shea v. Emmanuel College, 425 Mass. 761, 764 (1997). “The motivation of personal gain, including financial gain, . . . generally is not enough to satisfy the improper interference requirement.” King v. Driscoll, 418 Mass. at 587. Nor is “personal dislike” enough to prove an improper motive. Id. “Generally, the propriety of the [defendant’s] motives in a particular setting necessarily depends on the attending circumstances, and must be evaluated on a case-by-case basis.” Adcom Products, Inc. v. Konica Business Machines USA, Inc., 41 Mass.App.Ct. at 105. This Court concludes that a public official is always protected by qualified immunity from a claim of tortious interference that rests on the public official’s “improper motive” because liability in such cases necessarily rests on the defendant’s state of mind, not simply the nature of his conduct. Unless “improper means” are used, it is lawful to *148 interfere in good faith with a third party’s contract; it becomes tortious only if the motive is sinister. Therefore, in all such cases, no reasonable person could know that his conduct violated any clearly established right not to interfere with a third parly’s contract, because a reasonable person would not act with a sinister motive and the conduct alone, without that state of mind, is lawful.
A public official may not be protected by qualified immunity from a claim of tortious interference only when the alleged interference was committed through “improper means,” because only then would liability rest on the conduct alone and not on the public official’s state of mind. EIC has not made any allegation that any of the individual defendants used any improper means, such as physical violence, fraudulent misrepresentations, or other illegal conduct, to interfere with its leases and prospective leases regarding the Premises. Stated differently, EIC has not alleged any conduct by any of the individual defendants that would support a claim for tortious interference with contractual or advantageous relations if the conduct were committed in good faith. Rather, its claim rests solely on the allegedly “improper motive” of the individual defendants, which has transformed otherwise permissible conduct into tortious conduct.
It is appropriate to consider for a moment what the world would look like if public officials were not protected by qualified immunity from claims of tortious interference with contract based on alleged improper motive. In such a world, public officials would be vulnerable to personal liability whenever such a claim were made, because the allegation involves intentional conduct. The public official would never prevail on a motion to dismiss such a claim because the mere allegation of improper motive would be sufficient to defeat such a motion. While few such claims would likely succeed in proving that the public official acted with “improper motive,” since the definition of that term is so demanding, public officials would certainly fear such lawsuits because of the inherent unpredictability of legal findings regarding their state of mind. For all these reasons, some public officials would be intimidated by the threat of such a lawsuit because of the personal financial risks that a lawsuit would bring. They could not avoid such a lawsuit by ensuring that their conduct remained within “a safe harbor,” because the lawsuit would rest on their alleged improper motive, not the nature of their conduct. The only sure way to avoid a threatened lawsuit would be to capitulate to the demands of the party threatening such a suit. The common-law doctrine of qualified immunity was fashioned to protect public officials from liability from precisely such claims, so that public officials need not be affected in the performance of their public duties by the threat of a lawsuit regarding conduct that did not violate any clearly established right. For these reasons, the individual defendants motion to dismiss Count Six must be ALLOWED under the doctrine of qualified immunity.
ORDER
For the reasons stated above, this Court ORDERS as follows:
1. The MVDC’s motion to dismiss is ALLOWED as to Counts Four, Six, Eight, and Nine, and DENIED as to Count Ten;
2. The City of Everett’s motion to dismiss is ALLOWED as to Counts Five and Nine, and DENIED as to Count Ten; and
3. The individual defendants’ motion to dismiss Count Six is ALLOWED.

 The plaintiff, Essex Capital Partners, Inc., is described in ' the Second Amended Complaint as EIC’s “manager,” so both are collectively referred to as “EIC.”

 A constitutional claim for taking property without just compensation in violation of the Takings Clause of the Fifth Amendment, made binding on the states through the Due Process Clause of the Fourteenth Amendment, is not ripe until the property owner has sought to use the procedure made available by the state to provide just compensation for a taking and been denied just compensation. Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City, 473 U.S. 172, 194-97 (1985). Therefore, this Court will not view the constructive taking claim, at this time, as a constitutional claim, but instead will view it as an attempt to obtain just compensation through the applicable state procedure established under G.L.c. 79, §10.

 This judicial review may come in two forms. First, it may come in the usual form of judicial review of local government and agency decisions, whether done under G.L.c. 30A for final agency determinations or G.L.c. 40A, § 17 for zoning appeals. Alternatively, it may have a constitutional dimension challenging whether the regulation of property substantially advances legitimate state interests. Wilson v. Commonwealth, 31 Mass.App.Ct. at 764 & n.12. Either way, this judicial review must first be exhausted (or deemed futile) before a constructive taking claim can proceed if the reversal of the agency decision or the voiding of the regulation would eliminate file alleged taking. See Wilson v. Commonwealth, 413 Mass. 352, 356 (1992).

 This Court is aware that Superior Court Judge Susan Garsh, in her carefully crafted decision in Grasso v. City of New Bedford, 9 Mass. L. Rptr. 289, 1998 WL 795052 (Mass. Super. Nov. 2, 1998), recognized that similar allegations may constitute a constructive taking claim. However, this Court is also aware that Judge Garsh granted the defendant’s motion for summary judgment on this and the plaintiffs other claims, finding that the plaintiff had failed to provide evidence to support its contention either (1) that the City had abused its legitimate powers by intentionally taking action for the specific purpose of depressing the fair market value of the property, or (2) that the government’s actions were a substantial cause of the decline in the property’s value. Id. at *16. Since Judge Garsh dismissed this claim because of the insufficiency of the evidence, she did not need to consider whether such a claim should proceed had- there been sufficient evidence.

 By raising this possibility, the Court does not mean to infer that it has decided whether or not it would grant such a motion to amend.