ANTHONY RANDO & another[1] vs. TOWN OF NORTH
ATTLEBOROUGH; ALFRED CARPIONATO, intervener.

No. 96-P-0660.

Suffolk. October 9, 1997. - April 16, 1998.

Present: PERRETTA, DREBEN, & PORADA, JJ.

*Zoning,* Amendment of by-law or ordinance, Validity, Spot zoning, Contract
zoning, Planned development area. *Practice, Civil,* Findings by judge.

Discussion of cases considering "spot zoning" [606] and "contract zoning"
[607-608].
A judge of the Land Court correctly concluded that a town meeting's amend-
ment to the town zoning by-law, rezoning thirty-seven acres from
residential to commercial use, did not constitute unlawful spot zoning,
where the general public would receive considerable benefits thereby
[606]; and the record of the town meeting did not demonstrate that the
developer's promise of a "gift" to mitigate the impact of a commercial
development on neighboring residential property constituted an improper
"extraneous influence" such as would render the rezoning unlawful as
"contract zoning" [608-611].
A zoning decision by a town meeting was not demonstrated to be in violation
of the requirements of the town's master plan created pursuant to G. L.
c. 41, § 81D. [611-612]
There was no error in a Land Court judge's determination that a town
meeting's adoption of a rezoning proposal was a valid exercise of the
town's zoning power in that the amendment to the zoning by-law had a
reasonable relationship to the public welfare and safety and to the purposes
of G. L. c. 40A. [612-613]

CIVIL ACTION commenced in the Land Court Department on
April 27, 1994.
The case was heard by *Robert V. Cauchon,* J.
*Robert S. Sinsheimer* for the plaintiffs.
*Daniel R. Seigenberg* for the intervener.
*Robert C. Bliss,* for the defendant, submitted a brief.

[1]Anne Rando.

PERRETTA, J. Article 51 of the town meeting warrant, an amendment to the zoning by-law, was enacted by the defendant town of North Attleborough (town) after approval by the required two-thirds vote at the representative town meeting held October 23, 1993. The amendment changed approximately thirty-seven acres of land from a residential to a commercial zoning district. It was approved by the Attorney General, and notice of that approval was posted by the town clerk conformably with G. L. c. 40, § 32. See G. L. c. 40A, § 5. The plaintiffs then brought this action in the Land Court pursuant to G. L. c. 40A, § 4, and G. L. c. 231A, § 1. The trial judge found that the adoption of the amendment was a valid exercise of local zoning power and dismissed the plaintiffs' complaint. As below, the plaintiffs' principal arguments on appeal are that the amendment constitutes "spot" or "contract" zoning in violation of the Massachusetts Constitution and G. L. c. 40A, and that the town failed to follow its own "master plan" established pursuant to G. L. c. 41, § 81D. We affirm the judgment.

1. *The facts.* We relate the facts as found by the trial judge.[2] The plaintiffs reside at 31 Newport Avenue, Attleboro. Their property contains about eleven acres, all situated in Attleboro, and abuts the line dividing North Attleborough and Attleboro. Alfred Carpionato, the defendant-intervener, is a developer who owns approximately eighty-two contiguous acres of land in North Attleborough. This land abuts the Attleboro line as well as part of the plaintiffs' property.

On August 13, 1993, Carpionato, acting pursuant to G. L. c. 40A, § 5, filed a warrant article with the North Attleborough selectmen seeking to include on the October town meeting agenda a rezoning of approximately thirty-seven acres of land (locus) from an R-30 residential district to a C-60 commercial zoning district.[3] The plaintiffs' property does not abut the locus but is adjacent to a parcel of fourteen and one-half acres owned

---

[2]Except for one instance, which is discussed in part 4 of this opinion, *infra*, there is no claim that the trial judge's findings are clearly erroneous.

[3]The R-30 residential district allows, as of right, single family residences, country clubs, fishing clubs, tennis and golf clubs, and cemeteries. Hospitals, commercial stables, kennels, veterinary hospitals, and communications and television towers are allowed by special permit. The C-60 limited highway commercial district allows certain commercial development. Developments over five acres are subject to the issuance of special permits under the planned business development regulations while those which exceed ten acres are subject to the town's development impact statement process.

by Carpionato that will remain in the R-30 district. The locus is situated on the easterly side of Route 1, contiguous to land zoned C-60. A small mall, known as "Fashion Crossing," is located directly north of the locus, and a Walmart store is directly to the south. Also, there is a Bradlees store directly across Route 1 from the locus, and the Emerald Square Mall is diagonally across Route 1 from the locus.

Carpionato plans to develop the locus into a 260,000 square foot shopping mall and multiscreen movie complex. Under the town's 1974 zoning regulations, a 600-foot wide commercial strip fronting both sides of Route 1 was established within the R-30 residential district. Consequently, as rezoned, the locus effectively increases the width of the existing commercial strip along Route 1.

Prior to the October town meeting, Carpionato voluntarily made various proposals to State and town authorities which, as alleged, were intended to mitigate the potential impact of his planned commercial development. Those proposals included the creation of a fourteen and one-half acre "no build" buffer zone in an area to remain zoned as R-30, thereby shielding neighbors to the east, including the plaintiffs, from the C-60 district; provision for traffic improvements; the establishment of a "mitigation fund" for the town in the amount of $260,000;[4] the payment in mitigation of an amount between $400,000 and $450,000 to the Massachusetts Highway Department for roadway improvements; and an agreement not to seek a tax abatement on any of the rezoned land for a period of five years. Carpionato signed a "restrictive covenant," a "deed restriction," and a "mitigation covenant" memorializing some of these proposals. These signed documents were to be recorded at the registry of deeds after Article 51 was approved, without amendment, at the town meeting and by the Attorney General.

Additional facts will be related in conjunction with the resolution of the plaintiffs' claims of "spot" and "contract" zoning, each of which required the trial judge to determine "whether there has been shown any substantial relation between the amendment and the furtherance of any of the general objects of

---

[4]This amount, $260,000, represents $1 per square foot of retail space available for leasing. Carpionato also agreed to "make an additional gift to the Town of an amount equal to One Dollar ($1.00) per square foot for each leasable square foot of the building or buildings on Site in excess of 260,000 square feet."

the [zoning] enabling act." *Lanner* v. *Board of Appeal of Tewksbury*, 348 Mass. 220, 228 (1964). See *Johnson* v. *Edgartown*, 425 Mass. 117, 121 (1997).

2. *Spot zoning.* Spot zoning occurs when there is a "singling out of one lot for different treatment from that accorded to similar surrounding land indistinguishable from it in character, all for the economic benefit of the owner of that lot." *Whittemore* v. *Building Inspector of Falmouth*, 313 Mass. 248, 249 (1943). See *Board of Appeals of Hanover* v. *Housing Appeals Comm.*, 363 Mass. 339, 361-362 (1973). Such zoning "constitutes a denial of equal protection under the law guaranteed by the State and Federal Constitutions," *id.* at 362 n.15, and violates the "uniformity" requirement of c. 40A, § 4.[5] See *Canteen Corp.* v. *Pittsfield*, 4 Mass. App. Ct. 289, 293 (1976). See also Bobrowski, Massachusetts Land Use and Planning Law § 3.4.3 (1993).

Although Carpionato clearly benefits from the zoning amendment, the general public also received considerable benefits. See *Lanner* v. *Board of Appeal of Tewksbury*, 348 Mass. at 228-229; *Raymond* v. *Building Inspector of Brimfield*, 3 Mass. App. Ct. 38, 42 nn.3 & 4 (1975). The trial judge found that the town previously had rezoned sixty acres of commercial land to residential use and that the present amendment compensates for the loss of those sixty commercial acres. Further, it serves to increase the town's tax base and will likely increase the availability of retail services and employment opportunities. Citing *Martin* v. *Rockland*, 1 Mass. App. Ct. 167, 169 (1973), and *Sullivan* v. *Acton*, 38 Mass. App. Ct. 113, 117 (1995), for the respective propositions that "commercial development is a proper public goal that is appropriately achieved through zoning" and that it is proper to "concentrat[e] future development in a particular area," the trial judge concluded: "[The] locus, a parcel of vacant land adjacent to a commercial district on a main thoroughfare connecting two major metropolitan areas, can reasonably be viewed as an 'obvious area' for the expansion of an existing commercial zone." We agree. See *Cohen* v. *Lynn*, 333 Mass. 699, 704 (1956); *Raymond* v. *Building Inspector of Brimfield*, 3 Mass. App. Ct. at 42.

---

[5]Section 4, as inserted by St. 1975, c. 808, § 3, provides, in part: "Any zoning ordinance or by-law which divides cities and towns into districts shall be uniform within the district for each class or kind of structures or uses permitted."

3. *Contract zoning.* " 'Illegal contract zoning is said to involve the process by which a local government enters into an agreement with a developer whereby the government extracts a performance or promise from the developer in exchange for its agreement to rezone the property'. . . [and] . . . 'is disapproved of largely on the basis of the principle that a municipality may not contract away its police power to regulate on behalf of the general welfare.' " Bobrowski, *supra* at § 3.4.4, quoting from 1A Rathkopf, Zoning and Planning §§ 29A-25 and 29A-27 (4th ed. 1982). The plaintiffs argue that the zoning amendment is invalid because the town illegally bargained away its police powers in exchange for Carpionato's various proposals, as memorialized in the "restrictive covenant," "deed restriction," and "mitigation covenant," all of which were subject to an escrow agreement until the amendment was approved, without change, by the town and the Attorney General.

A remarkably similar argument was presented in *Sylvania Elec. Prod. Inc.* v. *Newton,* 344 Mass. 428 (1962), where the prospective developer of a tract of land, Sylvania, sought a zoning amendment changing the classification of the land from residential to limited manufacturing. After discussions with zoning officials, Sylvania voluntarily agreed to impose on the tract various conditions and use restrictions in addition to those already made applicable under the zoning ordinance to land within a limited manufacturing district. Those additional conditions and restrictions were as follows. Sylvania, which held an option to purchase the tract in issue, agreed to cede three acres of the parcel to the Oak Hill Park Association. Those three acres were to be retained in the residential district for a period of thirty years. Sylvania's agreement was to be set out in a deed to be attached to a proposed option agreement by which Sylvania would give the city a thirty-year option to purchase, for $300, a thirty-acre strip of land which was adjacent to land belonging to the Metropolitan District Commission. Sylvania also proposed other restrictions, including creation of a "buffer zone" upon which no buildings could be erected, limitation of the floor area of the planned buildings, and establishment of a pattern of traffic in connection with the construction of the premises. After the board of alderman enacted the zoning amendment, Sylvania recorded the option agreement and attached deed form. *Id.* at 431-432.

We set out the essentials of the court's reasoning in upholding the validity of the zoning amendment.

"[A]lthough no condition was imposed by the aldermen in their vote, the conclusion is inescapable that the option proposal was a significant inducement of the zoning amendment and the amendment induced the giving of the option.

"It is said that there was a purported, invalid exercise of the zoning power, for the vote operated to subject the locus not only to the restrictions of a limited manufacturing district but also to the restrictions of the option and deed form. But that is not, precisely, what happened. The induced, voluntary action of Sylvania, not the vote of the council, imposed the option restrictions; the vote reclassified land which was being subjected to those restrictions. The zoning decision was that the locus, so restricted by its owner, should be made a limited manufacturing district. That, in form, was an appropriate and untainted exercise of the zoning power.

"What was done involved no action contrary to the best interest of the city and hence offensive to general public policy. It involved no extraneous consideration (as, for example, a request to give land for a park elsewhere in the city) which could impeach the enacting vote as a decision solely in respect of rezoning the locus.

"We discern no aspect of spot zoning, lack of uniformity, or failure to conform to the comprehensive zoning plan. Even if the restrictions had been made a part of the zoning ordinance, they would not have created spot zoning. The site was all the land in the neighborhood which was proposed for reclassification. The private restrictions in no way made the locus less appropriate for classification as a limited manufacturing district. It is inconsequential that other areas elsewhere in the city, in, or to be put in, such a zoning district, would not have those restrictions. Requirements of uniformity and conformity to a plan do not mean that there must be identity of every relevant aspect in areas given the same zoning classification."

*Id.* at 433-434 (footnotes omitted).

The plaintiffs argue that there is an "extraneous consideration" in the present case which removes it from *Sylvania* and

renders the town meeting vote an invalid exercise of zoning power, viz., Carpionato's agreement to pay $260,000 directly to the town without that money being specifically tied to any projected costs to the town as a result of the development. As noted in *Sylvania*, 344 Mass. at 434, conditioning a zoning amendment upon a required payment into a municipality's general fund "could impeach the enacting vote" on the basis that it was not made "solely in respect of rezoning the locus."

We do not think a payment that is promised by the developer rather than required by the municipality and that is reasonably intended to meet public needs arising out of the proposed development can be viewed as an "extraneous influence" upon a zoning decision. See Wegner, Moving Toward the Bargaining Table: Contract Zoning, Development Agreements, and the Theoretical Foundations of Government Land Use Deals, 65 N.C. L. Rev. 957, 991 & n.181 (1987). Carpionato's "mitigation covenant" acknowledged that the zoning amendment, if enacted, would allow commercial development on the locus which, in turn, "will have substantial impact on the Town," and that "[i]n order to mitigate the effect of such rezoning, and the resultant commercial development that will take place thereafter on the Town, [Carpionato] hereby covenants . . . [to] make a gift to the Town" of $260,000, said amount calculated on the basis of $1 per square foot of retail space available in the building or buildings erected on the locus. See note 4, *supra*.

Although the plaintiffs rely heavily on the use of the word "gift" in the covenant, there was evidence to show that the money was intended to mitigate the impact of the development upon the town. In a letter sent to the town's planning board, Carpionato expressly stated that the money was being given to mitigate the impact of the development in the "surrounding neighborhoods and the entire North Attleborough community." While he advised the planning board that he had numerous suggestions as to how the money could be used, such as the repairing and repaving of Route 1, he also stated that "it would be inappropriate for us to tell the Town what it needs."

There was also the testimony of John Kokot, the executive vice-president of Carpionato Properties, Inc., and Robert Daylor, a site planner as well as a registered professional engineer and a registered land surveyor. Kokot testified that, because there was no set formula or methodology by which to determine the amount of any mitigation offer, he arrived at the figure of

$260,000 ($1 per square foot) on the basis of information about the proposed development itself, the mitigation offer made in the development of Emerald Square Mall, and opinions obtained from various people in North Attleborough.

Daylor testified that mitigation money is frequently used "for trade-off of density in the commercial zone," such as sidewalks, bicycle trails, or just green space and open space. He also explained that it is to a town's benefit to establish a mitigation fund without specifying the intended uses of that money at the initiation of a development process. The rationale for an early establishment of a general mitigation fund is especially applicable "in areas that are expanding quite rapidly in which there is a great deal of development activity, and a lot of the commercial development tends to get clustered around the malls, so you see development expanding in corridors. [Because of] [t]he uncertainty of the phasing and the speed and the exact type of development, from the town's perspective it's an advantage to have some dedication of funds so they can actually look at the real problems as the real problems develop."

Finally, the minutes of the town meeting discussion concerning passage of Article 51 do not support the claim of "extraneous influence." Those minutes show that Kokot spoke at the meeting and detailed not only what Carpionato was required by various State authorities to do in order to mitigate the impact of the development, especially in respect to a predictable traffic increase, but also what more he was volunteering to do. Consistent with the sentiment expressed in the earlier mentioned letter to the town's planning board, Kokot told the town meeting representatives, "I don't want to get involved in the personal solution, all I want to do is pay for it." The minutes indicate that one issue for debate by the town meeting representatives was the conflict between protecting the residential zone and increasing the tax base and employment opportunities. The details of that debate were not recorded and are, instead, reflected in the minutes as "much discussion."

Applying the analysis set out in *Sylvania Elec. Prod. Inc.* v. *Newton,* 344 Mass. at 434, to the evidence before us, we[6] conclude that the trial judge was not in error in finding that two-thirds plus one of the town meeting members were not improperly influenced to act on behalf of the developer rather

---

[6]We also think the contract analysis used by the court in *Dacy* v. *Ruidoso,* 114 N.M. 699, 703-704 (1992), although not decisive, is persuasive:

than in the best interests of the town. Cf. *Caires* v. *Building Commr. of Hingham*, 323 Mass. 589, 596 (1949).

4. *The town's master plan.* General Laws c. 41, § 81D, as amended through St. 1990, c. 372, requires that "[a] planning board . . . shall make a master plan of such city or town or such part or parts thereof as such board may deem advisable and from time to time may extend or perfect such plan." The plaintiffs claim that passage of the zoning amendment was not preceded by a traffic study as required under the master plan adopted by the town in 1991 and that the trial judge's finding to the contrary is clearly erroneous.[7]

There was evidence to show that Carpionato had filed an environmental impact report with the Secretary of Environmental Affairs setting out all the required studies that had been conducted relating to the project. See G. L. c. 30, § 62A. The report, which included a traffic study, was also circulated to the town planning board. There was also evidence to show that the zoning amendment furthered other goals of the master plan, including the allowance of a large commercial project with committed highway improvements as well as the increase of

---

"[O]ne form of contract zoning is legal: a unilateral contract in which a party makes a promise in return for a municipality's *act* of rezoning. In this situation, the municipality makes no promise and there is no enforceable contract until the municipality acts to rezone the property. Because the municipality does not commit itself to any specified action before the zoning hearing, it does not circumvent statutory procedures or compromise the rights of affected persons. Some courts have nonetheless condemned this form of contract zoning on the ground that the contracting party's promise provides improper motivation for the municipality's rezoning action. We do not find this reasoning persuasive. Private interests are inherent in any zoning matter; therefore, it is disingenuous to condemn a method of zoning because it benefits private interests in some way. Moreover, any potential misconduct that might occur through unilateral contract zoning may be corrected. through judicial review if the action of the zoning authority is improper." (Emphasis in original; citations omitted.)

[7]In advancing this argument, the plaintiffs rely upon the following statement in the town's master plan: "Requirements for detailed traffic studies and mandatory highway improvements should be added to all commercial districts. These requirements should apply not only to large projects . . . but also to projects such as fast food restaurants and convenience stores that can generate a high volume of traffic on a small amount of land."

commercial growth and development, especially in an area (Route 1) that already had substantial commercial development.

Additionally, the master plan itself provides that it "should not be construed as a 'blueprint' for the entire town," that a " 'blueprint' does not provide flexibility," and that it was not the intent of the planning board, in drafting the master plan, "to produce a rigidly structured document." The planning board expressed its view that it had produced a "flexible, usable document . . . which will provide the policies town officials will use to guide the growth and development of [the town] over the next 10 to 20 years in an orderly manner, in areas best suited for development according to the needs of all town residents, both present and future." The planning board expressly emphasized that the "plan is not cast in concrete . . . and its recommendations must change and evolve to reflect current conditions in [the town]."

Neither the master plan itself nor the law requires that zoning be in strict accordance with a master plan. See *Manning* v. *Boston Redev. Authy.*, 400 Mass. 444, 450-451 (1987). See also Bobrowski, *supra* at § 12.13. The most that can be thought required is an analysis by town officials before the zoning decision of land use planning considerations. See *National Amusements, Inc.* v. *Boston*, 29 Mass. App. Ct. 305, 310-311 (1990). There was sufficient evidence before the trial judge to show that this requirement had been satisfied, and we see no error in his finding.

5. *Adequacy of the findings.* There is complaint about the adequacy of the trial judge's findings, especially in respect to the history of Carpionato's attempts to have the locus rezoned. Although the trial judge admitted evidence as to that history, he did not find it relevant to the questions of whether the zoning amendment constituted spot zoning or contract zoning. The trial judge issued a well-reasoned decision. That he did not find the plaintiffs' evidence persuasive on certain issues does not diminish the force or validity of his decision. See *Willis* v. *Selectmen of Easton*, 405 Mass. 159, 161 (1989) (trial judge sitting without a jury need only "articulate the essential grounds for a decision").

We see no error in the trial judge's refusal to admit in evidence a "planning and zoning update" produced by the State Office of Planning and Management in which communities were "urged" to review *National Amusements, Inc.*, *supra*. Although

he excluded the update from evidence, the trial judge allowed the plaintiffs to cross-examine an expert witness about its contents for purposes of impeaching his knowledge of zoning and planning law. Nor do we see error in the trial judge's refusal to strike the testimony of the defendants' expert witnesses on the ground that they were unaware that Carpionato intended to include a movie theater within the proposed project. The trial judge knew of Carpionato's intention, and he was able to evaluate the experts' testimony in light of the fact that they did not.

6. *Conclusion.* It follows from what we have said that we conclude there was no error in the trial judge's decision that the adoption of Article 51 was a valid exercise of the town's zoning power in that the amendment has a reasonable relationship to the public welfare, safety, and purposes of G. L. c. 40A.

*Judgment affirmed.*