Maurice Durand & others[1] *vs.* IDC Bellingham, LLC,
& others[2] (and a companion case[3]).

Suffolk. April 7, 2003. - August 15, 2003.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Municipal Corporations,* Town meeting, Police power. *Zoning,* Amendment of
   by-law or ordinance, Validity of by-law or ordinance, Contract zoning.

Civil actions commenced in the Superior Court Department
and the Land Court Department on January 23, 2001.

---

[1]Jerry Novicky; Lorraine Spencer; Brian Sutherland; Donald Keller; Debra
E. Ferullo; Robert Loftus, Jr.; and Kenneth M. Hamwey.

[2]Zoning board of appeals of Bellingham; Varney Brothers Sand & Gravel
Co. Inc. (Varney Brothers); and the town of Bellingham.

[3]The plaintiffs filed two separate suits, one in the Land Court and one in the
Superior Court. The two cases were consolidated in the Land Court.

After consolidation in the Land Court, the case was heard by *Peter W. Kilborn,* J., on a motion for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*W.P. Colin Smith, Jr. (Bartholomew P. Molloy* with him) for IDC Bellingham, LLC, & another.

*Kenneth L. Kimmell (Elizabeth M. Heller* with him) for the plaintiffs.

The following submitted briefs for amici curiae:

*Thomas J. Urbelis* for Massachusetts City Solicitors and Town Counsel Association.

*Martin R. Healy, Adam N. Weisenberg, Gordon H. Piper, R. Jeffrey Lyman, & Michael K. Murray* for Massachusetts Chapter of the National Association of Industrial and Office Properties.

*Carl K. King* for Massachusetts Chapter of the American Planning Association.

CORDY, J. On May 28, 1997, residents attending the town of Bellingham's (town's) open town meeting voted to rezone a parcel of land located in the town. Three and one-half years later, several residents living near the parcel brought suit challenging the rezoning. The question before the court is whether the town meeting vote was invalid because the prospective owner of the parcel, IDC Bellingham, LLC (IDC), had offered to give the town $8 million if the rezoning was approved and a power plant was built and operated on the site.

1. *Background.* The essential facts of this case are undisputed. In 1993, the town began to examine ways to increase its property tax base. An economic development task force was appointed by the town's board of selectmen (board) to study the issue. The task force prepared a report recommending that development of industrial land in the town be a priority. The report identified a parcel on the corner of Depot Street and Box Pond Road (locus), which abutted land that was already zoned for industrial use, as a candidate for rezoning from agricultural and suburban use to industrial use. Subsequently, at the town's May, 1995, town meeting, a zoning article proposing the rezoning of the locus and an adjacent parcel for industrial use fell

eight votes short of the required two-thirds majority.

In 1997, IDC, which owned a power plant in the town, began discussions with town officials about the possibility of rezoning the locus so that a second plant might ultimately be built on it. These discussions included the subject of what public benefits and financial inducements IDC might offer the town with regard to the proposed plant. The town administrator told IDC officials that the town was facing an $8 million shortfall in its plans to construct a much needed new high school. Shortly thereafter, the president of IDC publicly announced that IDC would make an $8 million gift to the town if IDC (1) decided to build the plant; (2) obtained the financing and permits necessary to build the plant; and (3) operated the plant successfully for one year. The offer was made to generate support for the plant and became common knowledge in the town.

While the genesis of the offer was the need for a new high school, IDC made it clear that the town could use the money for any municipal purpose. The town's high school building committee, the town's finance committee, the town's master plan steering committee, and certain town officials voiced strong support for the plant and the zoning change required for its construction on the locus. Some committee members engaged in a campaign to get voters to the town meeting at which the rezoning was to be considered.

On May 28, 1997, the town held its open town meeting and a zoning article calling for the rezoning of the locus was introduced.[4] IDC made a presentation of its proposed use of the locus for a second power plant and reiterated its offer of an $8 million gift to the town if the plant was built and became operational. The planning board and finance committee both recommended passage of the zoning article. There was some discussion of the zoning aspects of the proposal, as well as discussion regarding the offered gift. Residents for and against the proposal to build a plant on the site spoke, and IDC responded to their comments. The zoning article passed by more than the necessary two-thirds vote of the town meeting.

Between May, 1997, and January, 2001, IDC spent ap-

---

[4]Once a proposed zoning change is rejected, as it was here in May, 1995, it may not be reconsidered for two years. G. L. c. 40A, § 5, sixth par.

proximately $7 million to develop the locus for a power plant.[5] At some point in the summer of 1998, the board learned that IDC was proposing to increase the size of the plant beyond what it had presented to the town meeting in 1997. Consequently, the board wrote a letter to the energy facilities siting board withdrawing its support for the plant.[6] Shortly thereafter, representatives of IDC and the board met to negotiate a compromise. The outcome of those negotiations was an agreement by IDC to reduce the size of the plant and, in April, 1999, the execution of an "Agreement for Water/Wastewater Services" between IDC and the town. The agreement provided in part that:

> "IDC shall provide funds ($8,000,000.00) to the Town for its various capital expenditures, municipal projects and municipal improvements . . . . This Agreement is intended to memorialize, without duplicating the $8,000,000 commitment IDC and its affiliates previously made to the Town in connection with the Plant."

IDC submitted a request for five special permits to the town's zoning board of appeals on May 5, 2000, and the special permits were granted on January 2, 2001. On January 23, 2001, the plaintiffs, eight landowners located near the locus, filed suit in the Land Court against IDC, the town, the town zoning board of appeals, and the owner of the property. The plaintiffs' amended complaints make three claims. Count I contends that the grant of the five special permits was arbitrary, capricious, lacking in substantial evidence, and ultra vires. (This count was not acted on in the trial court and is not before us.) Counts II and III seek declaratory judgment, under different statutory provisions,[7] that

---

[5] In May, 1997, the locus was owned by Varney Brothers; IDC held an option to purchase it. In 1999, Varney Brothers conveyed its interest in the locus to an entity called Depot Street LLC. There is no record of IDC's exercising its option, and so we assume that at all relevant times IDC held an option on, but did not own, the locus. The distinction between ownership and the possession of an option is not relevant to this case.

[6] The approval of the energy facilities siting board is required prior to the construction of any "generating facility." G. L. c. 164, §§ 69H-69J½.

[7] Count II seeks a declaratory judgment pursuant to G. L. c. 231A, the general declaratory judgment statute; count III seeks a declaratory judgment

the rezoning of the locus on May 28, 1997, was void because it constituted illegal "contract" or "spot" zoning and because the text of the enacted zoning amendment differed substantially from the text of the proposed amendment. The defendants filed an answer alleging several affirmative defenses, including statute of limitations and laches.

The defendants moved for summary judgment on counts II and III of the amended complaints, arguing that the zoning amendment constituted neither "contract" nor "spot" zoning and reasserting their affirmative defense of laches.[8] Before the Land Court, the plaintiffs abandoned their claim that the amendment was void because it differed substantially from the proposed amendment and conceded that the zoning amendment did not constitute spot zoning, which is prohibited by G. L. c. 40A, § 4.[9] The judge denied summary judgment to the defendants and, on his own motion, granted summary judgment to the plaintiffs.

In his decision, the judge discussed whether "contract zoning" existed as a "separate ground for invalidating a zoning ordinance." Assuming that it did, the judge found that "contract zoning" had not occurred here, at least within the meaning he ascribed to that term. He then found that "there would be little doubt that the 1997 rezoning was valid" if the $8 million gift offer had not been made, and proceeded to discuss its implications. He viewed the offer of the gift as an "extraneous consideration," because it was not defended as being in mitigation of the impacts of the project, and therefore concluded that it was "offensive to public policy." He ultimately concluded

pursuant to G. L. c. 240, § 14A, which allows a landowner to sue for declaratory relief over the effect of a zoning ordinance.

[8]In their summary judgment motion, the defendants did not reassert their statute of limitations defense as a separate basis for judgment in their favor. Before this court they argue that the purported violation of the statute of limitations is evidence that the plaintiffs unnecessarily delayed their suit and thus should be barred by laches. We do not consider the statute of limitations as a separate ground for relief and, in light of our ruling on the merits, find it unnecessary to address the affirmative defense of laches.

[9]General Laws c. 40A, § 4, mandates that all zoning requirements be "uniform." This mandate forecloses a municipality from engaging in spot zoning, which involves singling out an individual parcel for unique zoning treatment. See *Rando* v. *North Attleborough*, 44 Mass. App. Ct. 603, 606 (1998).

that the fact that the offer was made was sufficient, without the necessity of finding that voting town meeting members were influenced by it, to nullify the rezoning vote, citing *Sylvania Elec. Prods. Inc.* v. *Newton*, 344 Mass. 428, 434 (1962) (stating that developer's consideration to town did not nullify zoning vote because it was not "extraneous consideration" unconnected to project). The defendants appealed and this court transferred the cases on its own motion. Because we conclude that the voluntary offer of public benefits beyond what might be necessary to mitigate the development of a parcel of land does not, standing alone, invalidate a legislative act of the town meeting, we reverse.[10]

2. *Discussion.* Prior to the passage of art. 89 of the Amendments to the Massachusetts Constitution (the "Home Rule Amendment") in 1966, the power of a municipality to enact or amend zoning bylaws was a power derived exclusively from the "supreme" power of the Legislature in zoning matters, and a municipality had only such authority as the Legislature saw fit to delegate specifically to it. *Board of Appeals of Hanover* v. *Housing Appeals Comm.*, 363 Mass. 339, 356-357 (1973). The Home Rule Amendment granted cities and towns "independent municipal powers which they did not previously inherently possess" to adopt, amend, or repeal local ordinances or bylaws "for the protection of the public health, safety and general welfare." *Id.* at 358, 359. The zoning power was one of the "independent municipal powers" granted to cities and towns by the Home Rule Amendment, enabling them to enact zoning ordinances or bylaws as an exercise of their "independent police powers" to control "land usages in an orderly, efficient, and safe manner to promote the public welfare," *id.* at 359, as long as their enactments were "not inconsistent with the Constitution or laws enacted by the Legislature," *id.* at 358.

The enactment of a zoning bylaw by the voters at town meeting is not only the exercise of an independent police power; it is also a legislative act, see *Sylvania Elec. Prods. Inc.* v. *New-*

---

[10]We acknowledge the amicus briefs of the Massachusetts Chapter of the American Planning Association, the Massachusetts City Solicitors and Town Counsel Association, and the Massachusetts Chapter of the National Association of Industrial and Office Properties.

*ton, supra* at 433, quoting *Church* v. *Islip*, 8 N.Y.2d 254, 259 (1960), carrying a strong presumption of validity. It will not normally be undone unless the plaintiff can demonstrate "by a preponderance of the evidence that the zoning regulation is arbitrary and unreasonable, or substantially unrelated to the public health, safety . . . or general welfare." *Johnson* v. *Edgartown*, 425 Mass. 117, 121 (1997). If the reasonableness of a zoning bylaw is even "fairly debatable, the judgment of the local legislative body responsible for the enactment must be sustained." *Crall* v. *Leominster*, 362 Mass. 95, 101 (1972).[11] Such an analysis is not affected by consideration of the various possible motives that may have inspired legislative action. See *Merriam* v. *Secretary of the Commonwealth*, 375 Mass. 246, 253 (1978), quoting *Morgan* v. *Banas*, 331 Mass. 694, 698 (1954) ("courts cannot, for the purpose of determining the validity of legislation, receive evidence of the inducements and motives of the legislators in enacting it"); *Simon* v. *Needham*, 311 Mass. 560, 566 (1942) ("action of the voters is not to be invalidated simply because someone presented a reason that was unsound or insufficient in law to support the conclusion for which it was urged"); *Boston* v. *Talbot*, 206 Mass. 82, 91 (1910), quoting *Soon Hing* v. *Crowley*, 113 U.S. 703, 710-711 (1885) ("courts cannot inquire into the motives of the legislators in passing [enactments] . . . . The diverse character of such motives, and the impossibility of penetrating into the hearts

[11]The substantial deference extended to municipal zoning enactments is consistent with the deference extended to other legislative acts. See *Connors* v. *Boston*, 430 Mass. 31, 35 (1999) (municipal acts presumed to be valid, upheld unless inconsistent with State or Federal law); *Commonwealth* v. *Henry's Drywall Co.*, 366 Mass. 539, 543 n.5 (1974) ("unless the statute is patently offensive, [we] will defer to the legislative finding of facts"); *Marshal House, Inc.* v. *Rent Control Bd. of Brookline*, 358 Mass. 686, 695 (1971) ("as long as there are possible findings which the [legislative body] could reasonably have made in the legitimate exercise of the police power its acts will be upheld"); *Commonwealth* v. *Leis*, 355 Mass. 189, 192 (1969), quoting *Sperry & Hutchinson Co.* v. *Director of the Div. on the Necessaries of Life*, 307 Mass. 408, 418 (1940) ("Unless the act of the [legislative body] cannot be supported upon any rational basis of fact that reasonably can be conceived to sustain it, the court has no power to strike it down . . ."); *W.R. Grace & Co.- Conn.* v. *City Council of Cambridge*, 56 Mass. App. Ct. 559, 566 (2002) ("we accord municipalities deference as to their legislative choices").

of men and ascertaining the truth, precludes all such inquiries as impracticable and futile").[12]

It is within this framework that the court reviews the validity of the town's enactment of the article rezoning the locus. We determine first whether its enactment violated State law or any constitutional limitation (the plaintiffs have made no constitutional claim), and second whether it was an arbitrary or unreasonable exercise of police power having no substantial relationship to the public health, safety, or general welfare. The plaintiffs bear a heavy burden on both counts, and to sustain that burden "must prove facts which compel a conclusion that the question [of the validity of the ordinance] is not even fairly debatable." *Crall* v. *Leominster, supra* at 103.

a. *State law.* Municipal zoning procedure is governed by G. L. c. 40A. Section 5 dictates the process a municipality must follow in amending its zoning bylaws. G. L. c. 40A, § 5. In a town, such an amendment must be submitted to the board, which, within fourteen days, must then refer the amendment to the planning board for review. G. L. c. 40A, § 5, first par. The planning board has sixty-five days during which to hold a public hearing, with notice provided beforehand, at which members of the public can offer their views on the amendment. G. L. c. 40A, § 5, second par. Once the hearing has been held, the planning board has twenty-one days to provide its recommendation to the town meeting. Thereafter, the town meeting may adopt, reject, or amend the proposed amendment to the zoning bylaw. The town meeting must act, however, within six months of the planning board hearing. G. L. c. 40A, § 5, fourth par. The amendment will not be enacted unless it receives a two-thirds vote from town meeting. G. L. c. 40A, § 5, fifth par. Neither party claims that this process was not followed, and the record before us indicates that it was.

An agreement between a property owner and a municipality to rezone a parcel of land may cause the municipality to violate

[12]But see *Pheasant Ridge Assocs. Ltd. Partnership* v. *Burlington*, 399 Mass. 771, 779 (1987) (where undisputed evidence "requires" conclusion that town's exercise of eminent domain had been bad faith attempt to contravene State's affordable housing law, G. L. c. 40B land taking could be invalidated). The *Pheasant Ridge* case, decided under a different statute intended to limit rather than grant municipal power, is inapposite to the question at hand.

the process mandated by § 5. Such an instance of "contract zoning," as we will refer to it,[13] involving a promise by a municipality to rezone a property either before the vote to rezone has been taken or before the required § 5 process has been undertaken, evades the dictates of G. L. c. 40A, and may render the subsequent rezoning invalid. The Land Court judge correctly concluded that no such advance agreement existed in this case. IDC pledged that if the town were to rezone the locus for industrial use (and if other events occurred), IDC would pay the town $8 million. At no time before the May 28, 1997, town meeting were the voters of town meeting bound to approve the zoning change.[14] Because the town followed the procedures dictated by § 5, the rezoning was not invalid on statutory grounds.[15,16]

In his decision, the Land Court judge also noted this court's

---

[13]See note 16, *infra.*

[14]As the Land Court judge recognized, in the circumstance where the town meeting is the governmental body charged with the responsibility for approving or denying a zoning bylaw, it is difficult to imagine how there could be an agreement in advance of the vote to approve such an action.

[15]A municipality's decision to amend its zoning bylaw is also constrained by the State's "reserved powers doctrine," which bars a legislative body from bargaining away its police powers. See *Opinion of the Justices,* 341 Mass. 760, 784 (1960), quoting *Atherton* v. *Selectmen of Bourne,* 337 Mass. 250, 255-256 (1958) ("right to exercise the police power cannot be relinquished even by explicit stipulation"); *Boston Elevated Ry.* v. *Commonwealth,* 310 Mass. 528, 552 (1942); 1 P.J. Rohan, Zoning and Land Use Controls § 5.02[2][a], at 5-38 to 5-39 (2003) ("general rule is that cities, towns, villages, and other municipal corporations have no power to make contracts that control or limit them in the exercise of their present or future legislative powers and duties"); 4 A.H. Rathkopf & D.A. Rathkopf, Zoning and Planning § 44:10 (2001) (unlawful for municipality to bargain away police power). Some forms of "contract zoning" are "suspect because of the concern that a municipality will contract away its police power to regulate on behalf of the public in return for contractual benefits offered by a landowner whose interest is principally served by the zoning action." *McLean Hosp. Corp.* v. *Belmont,* 56 Mass. App. Ct. 540, 545 (2002). There was no evidence, however, that the town bargained away its police power in this case. The town merely acted on an offer by IDC; its power to approve or reject the proposed zoning amendment remained unencumbered, as did its power to rezone the property in the future if circumstances made it necessary for the protection of the public health, safety, or general welfare to do so.

[16]In *Dacy* v. *Ruidoso,* 114 N.M. 699, 703-704 (1992), the Supreme Court of New Mexico persuasively analyzed a village's vote to rezone a parcel in response to a promise by a proponent as "unilateral contract zoning," which it

suggestion in *Sylvania Elec. Prods. Inc.* v. *Newton*, 344 Mass. 428 (1962), that "contract zoning" encompasses the express conditioning of rezoning on a developer's promises to restrict the use of his land and provide benefits to the town. While the judge proceeded to find that "[w]e do not have that here," we note that zoning law and practice have changed since the *Sylvania* case was decided in 1962, and labels such as "contract zoning" may not be helpful or determinative in resolving the validity of a zoning enactment. Courts and commentators have given different meanings to the term "contract zoning," and those meanings have changed over time.[17] More importantly, the legal context in which zoning actions are evaluated has also changed.

found to be perfectly legal: "In this situation, the municipality makes no promise and there is no enforceable contract until the municipality acts to rezone the property. . . . Because the municipality does not commit itself to any specified action before the zoning hearing, it does not circumvent statutory procedures or compromise the rights of affected persons." (Citation omitted.) *Id.* The court rejected the argument that a proponent's promise would provide improper motivation for the rezoning action, noting, "We do not find this reasoning persuasive. . . . [A]ny potential misconduct that might occur through unilateral contract zoning may be corrected through judicial review if the action of the zoning authority is improper." *Id.* at 704.

[17]When *Sylvania Elec. Prods. Inc.* v. *Newton*, 344 Mass. 428 (1962), was decided, many courts concurred in its definition of "contract zoning" as the zoning of a parcel of land contingent on the landowner's performance of certain acts. See, e.g., *Arkenberg* v. *Topeka*, 197 Kan. 731, 737 (1966). Today, that definition has been generally discarded, see 1 P.J. Rohan, *supra* at § 5.01[2] (describing evolution of usage), and courts now disagree as to what "contract zoning" actually means. Compare *Dacy* v. *Ruidoso*, *supra* at 702 (defining "contract zoning" as any agreement between municipality and landowner involving rezoning), with *Kerik* v. *Davidson County*, 145 N.C. App. 222, 232 (2001) (defining "contract zoning" only as agreement involving reciprocal promises between municipality and landowner). See *Rando* v. *North Attleborough*, 44 Mass. App. Ct. 603, 607 (1998), quoting M. Bobrowski, Massachusetts Land Use and Planning Law § 3.4.4 (1993) in which the Appeals Court characterized "contract zoning" as a situation where "a local government enters into an agreement with a developer whereby the government extracts a performance or promise from the developer in exchange for its agreement to rezone the property."

In addition, new terminology has emerged, and what one court or commentator may term "contract zoning," another might now label as something else. For example, "conditional zoning" has been described as an act in which "the local government does not commit itself to any legally enforceable reciprocal promises," but instead merely commits an act of rezoning that has the effect of triggering an offer that was made by the developer and was contingent on the rezoning. 1 P.J. Rohan, *supra* at § 5.01[3], at 5-15. But in

The *Sylvania* court was concerned with the use by municipalities of the device of contract to restrict or condition the use of land in a manner beyond the authority then delegated to them by the Legislature and embodied in zoning enabling laws. The municipal power of zoning is, however, no longer a matter of delegated State legislative power. The practice of conditioning otherwise valid zoning enactments on agreements reached between municipalities and landowners that include limitations on the use of their land or other forms of mitigation for the adverse impacts of its development is a commonly accepted tool of modern land use planning, see 4 A.H. Rathkopf & D.A. Rathkopf, Zoning and Planning § 44.12 (2001) (noting general approval of practice as "valuable planning tool"), constrained, of course, by constitutional limitations not at issue here.[18]

b. *Validity of the bylaw as exercise of legislative police power.*

*Dacy* v. *Ruidoso, supra* at 702-704, the court labeled this type of transaction as "unilateral contract zoning." In addition, what the *Sylvania* case and its contemporaries once called "contract zoning" is now sometimes called "contingent zoning," see, e.g., *Old Canton Hills Homeowners Ass'n* v. *Mayor & City Council of Jackson*, 749 So. 2d 54, 57 (Miss. 1999).

A court examining a zoning arrangement should not affix a formalistic label to it, but rather should engage in the substantive inquiry that we undertake here, namely ascertaining whether the zoning action is consistent with State law and constitutional requirements, and otherwise meets the criteria for a valid exercise of police power.

[18]The Fifth Amendment to the United States Constitution prohibits a governmental entity from taking private property for public use without just compensation. In *Nollan* v. *California Coastal Comm'n*, 483 U.S. 825, 836-837 (1987), the Supreme Court held that this prohibition prevents a governmental body from conditioning the approval of a building permit on requirements imposed on the landowner unless there is a "nexus" between the requirements imposed and the interests that the governmental body would be properly protecting in denying the permit outright. See *Dolan* v. *Tigard*, 512 U.S. 374, 391 (1994) (requiring "rough proportionality" between requirements imposed and interests protected). This rule has been applied to requirements imposed on a landowner as a condition of a municipality's rezoning of property. See, e.g., *Goss* v. *Little Rock*, 90 F.3d 306, 309 (8th Cir. 1996) (applying *Nollan* rule to municipal decision granting rezoning request); *Ehrlich* v. *Culver City*, 12 Cal. 4th 854, 859, cert. denied, 519 U.S. 929 (1996) (*Nollan* applies to exactions imposed as condition of approving request that real property be rezoned). It has also been held to apply to government extraction of money as much as to the imposition of restrictions on the use of real property. See *id.* (*Nollan* applies to "*monetary* exaction imposed by [defendant]" [emphasis in original]). Accord *Eastern Enters.* v. *Apfel*, 524 U.S. 498 (1998) (Fifth Amendment applies to government-required payments

The judge found that absent the $8 million offer, the rezoning was substantively valid. We take that to mean that it was neither arbitrary nor unreasonable, and was substantially related to the public health, safety, or general welfare of the town. In other words, its adoption served a valid public purpose. The record fully supports this conclusion. The locus abutted land zoned for industrial use; a town-appointed task force (preceding and completely unrelated to the power plant development proposal) had recommended its rezoning after studying the town's tax base and the need for economic development[19]; and a previous rezoning attempt based on that recommendation had just barely failed to get the necessary two-thirds majority at the 1995 town meeting.

In sum, the enactment of the bylaw rezoning the locus was not violative of State law or constitutional provisions, and met the substantive requirements of a valid exercise of legislative police power. Nevertheless, the judge set it aside because he concluded that the $8 million offer was an "extraneous consideration," that is, an offer not "tied to the impacts of the project" and therefore "offensive to public policy." We must decide whether such a consideration, voluntarily offered as part of a campaign in support of a development project, constitutes an independent ground on which to set aside a legislative act, regardless of its otherwise valid nature. If it is, we must decide further whether the mere existence of an "extraneous consideration" invalidates the legislative act as a matter of law, regardless whether it is proved to have actually influenced the votes of the legislative body. Because we conclude that a voluntary offer of public benefits is not, standing alone, an adequate ground on which to set aside an otherwise valid legislative act, we do not reach the second question.

The judge's conclusion that an "extraneous consideration"

---

into benefits fund). IDC makes no Fifth Amendment claim and the plaintiffs in this case would have no standing to do so. See *United States* v. *Dow,* 357 U.S. 17, 20 (1958); *United States Olympic Comm.* v. *Intelicense Corp., S.A.,* 737 F.2d 263, 268 (2d Cir.), cert. denied, 469 U.S. 982 (1984); *Lacey* v. *United States,* 595 F.2d 614, 619 (Ct. Cl. 1979).

[19]Promoting economic development is a proper basis for a town's exercise of its zoning power. See *Rando* v. *North Attleborough, supra* at 606, quoting *Whittemore* v. *Building Inspector of Falmouth,* 313 Mass. 248, 249 (1943).

invalidates a zoning ordinance is based on a remark of this court in *Sylvania Elec. Prods. Inc.* v. *Newton,* 344 Mass. 428, 434 (1962), that a developer's voluntary promise of benefits did not include an "extraneous consideration . . . which could impeach the enacting vote as a decision solely in respect of rezoning the locus." The opinion cites no supporting authority for the proposition that the presence of an "extraneous consideration" at the time of the vote on a zoning amendment would invalidate the vote, but the language has since been given added life in two cases decided by the Appeals Court, see *McLean Hosp. Corp.* v. *Belmont,* 56 Mass. App. Ct. 540, 546-547 (2002) (noting that "extraneous consideration" is ground on which to challenge zoning enactment); *Rando* v. *North Attleborough,* 44 Mass. App. Ct. 603, 608-609 (1998) (no "extraneous consideration" where voluntary promise of payment by developer reasonably intended to meet public needs arising from project). Both cases cite the *Sylvania* language, but neither invalidated the zoning ordinance in issue.

In general, there is no reason to invalidate a legislative act on the basis of an "extraneous consideration," because we defer to legislative findings and choices without regard to motive. We see no reason to make an exception for legislative acts that are in the nature of zoning enactments, and find no persuasive authority for the proposition that an otherwise valid zoning enactment is invalid if it is in any way prompted or encouraged by a public benefit voluntarily offered. We conclude that the proper focus of review of a zoning enactment is whether it violates State law or constitutional provisions, is arbitrary or unreasonable, or is substantially unrelated to the public health, safety, or general welfare. *Board of Appeals of Hanover* v. *Housing Appeals Comm.,* 363 Mass. 356, 358 (1973). *McLean Hosp. Corp.* v. *Belmont, supra* at 547. In the absence of any infirmity other than the existence of a voluntary offer to make a gift to the town at some time in the future when the power plant became operational, we conclude that the judge erred in holding the zoning ordinance invalid and granting summary judgment to the plaintiffs.

3. *Conclusion.* The entry of summary judgment for the plaintiffs on counts II and III of the amended complaints is

vacated, and the case is remanded to the Land Court with instructions to enter summary judgment on behalf of the defendants as to counts II and III.[20]

*So ordered.*

SPINA, J. (concurring in part and dissenting in part, with whom Ireland and Cowin, JJ., join). I concur with the result the court reaches, but I disagree with the reasoning of the decision.

A town is a "corporate entit[y]." Art. 89, § 8(4), of the Amendments to the Massachusetts Constitution. See *Opinion of the Justices*, 416 Mass. 1201, 1202-1203 (1993). Corporations act through their authorized agents, and when a corporation's actions come into question, we attribute to the corporation the actions, words, and knowledge of its agents acting within their authority. This principle applies equally to business and municipal corporations alike. See *Pheasant Ridge Assocs. Ltd. Partnership* v. *Burlington*, 399 Mass. 771, 777 (1987), and cases cited. The vote of a town meeting, valid on its face, may be invalid if it can be shown that the dominant motives or reasons for the action were unlawful. *Id.* See *Sylvania Elec. Prods. Inc.* v. *Newton*, 344 Mass. 428, 433-434 (1962) ("significant inducement . . . [if] extraneous . . . could impeach the enacting vote as a decision solely in respect of rezoning the locus"). The motives and reasons of a town meeting, unlike the motives and reasons of members of the Legislature, may be the proper subject of inquiry.

A municipality may not relinquish its police power by contract. See *Opinion of the Justices*, 341 Mass. 760, 784 (1960). The zoning power of a municipality is among its police powers. See *Leahy* v. *Inspector of Bldgs. of New Bedford*, 308 Mass. 128, 132 (1941). There is no dispute here that the zoning change is valid on its face, but the issue that must be addressed is whether the town meeting entered into an unlawful agreement that called for it to relinquish its zoning power. In my

---

[20]After granting summary judgment for the plaintiffs on counts II and III, the judge ordered that judgment be granted in their favor, because his ruling rendered count I moot. Our disposition of this case may require that, on remand, the judge address count I.

view, there is no material fact in dispute, and the facts show that the town meeting improperly agreed to exercise its power to rezone land in exchange for a promise to pay money. The exercise of that power to approve the requested zoning change was a condition precedent to the promise of IDC Bellingham, LLC (IDC Bellingham), to pay money under its agreement with the town of Bellingham (town). See *Massachusetts Mun. Wholesale Elec. Co.* v. *Danvers*, 411 Mass. 39, 45 (1991).

The Land Court judge highlighted the following facts from the summary judgment record. In the plaintiffs' first set of interrogatories to the town, they asked whether construction of the power plant generated a need for $8 million for new school construction. The town answered, "No. The rezoning of the land as industrial would result in a significant diminishment of potential residences and their school age children." In response to an interrogatory asking if the "construction and operation of the proposed IDC power plant generate[d] a need for 8 million dollars [to] address the anticipated impact from the Power Plant," the town answered, "No." In response to a similar interrogatory, IDC Bellingham answered, "Construction and operation of the proposed Bellingham facility will have minimal adverse impacts upon the Town and its residents. . . . IDC believed that in view of the market in 1997 and prior gifts provided to the Town, an $8 million gift would be an appropriate reward to the community for its acceptance of the plant." Stephen B. Roy, president of IDC Bellingham, indicated in his deposition that the company believed the $8 million offer would build community support for the plant, and he expected that the town's residents would rely on his promise and trust IDC Bellingham to keep its word.

At the annual town meeting on May 28, 1997, at which the proposed zoning change was approved, Roy reiterated the offer as a gift to the town, and indicated that it could be used for the town's school system. Some citizens questioned the validity of the offer and whether IDC Bellingham could be trusted to fulfil the promise, whereupon the high school building committee chairman asserted, "I think that these people can be trusted." As a result of IDC Bellingham's offer, numerous town committee members had joined IDC Bellingham officials publicly in

their campaign for approval of the zoning change during the weeks before the annual town meeting, and at the town meeting itself. The $8 million offer dominated the discussion on the warrant article, and there was little discussion about the proposed rezoning.

The summary judgment record establishes that IDC Bellingham offered the town $8 million, on condition that the town meeting approve the zoning change.[1] The same request for a zoning change had failed two years earlier, and the only change in circumstances was the $8 million offer. The town meeting accepted the offer and voted for the zoning change. The undisputed evidence indicates that the vote was not "a decision solely in respect of rezoning the locus." *Sylvania Elec. Prods. Inc.* v. *Newton, supra* at 434. The parties struck a bargain: the payment of money in return for a zoning change. Representatives from IDC Bellingham walked away from the town meeting with their zoning change and an unenforceable promise to pay $8 million. There can be no doubt that were IDC Bellingham to default on its promise, the town would be left with a questionable contract claim based on a sale of its police power in reliance on a promise.

It was a sale of the police power because there is nothing in the record to legitimize the $8 million offer as "intended to mitigate the impact of the development upon the town," or as "reasonably intended to meet public needs arising out of the proposed development." *Rando* v. *North Attleborough*, 44 Mass. App. Ct. 603, 609 (1998). The record does not show that the money "bear[s] some identifiable relationship to the locus so that there can be assurance that the town's legislative body did not act for reasons irrelevant to the zoning of the site at issue." *McLean Hosp. Corp.* v. *Belmont*, 56 Mass. App. Ct. 540, 548 (2002). This analysis is consistent with the law as applied to similar situations in other areas of zoning: towns may not exact hefty payments or require conditions unrelated to any aspect of a site in return for favorable government action. See, e.g., *Middlesex & Boston St. Ry.* v. *Aldermen of Newton*, 371 Mass. 849, 853-859 (1977) (city could not condition special permit for

---

[1] There were other conditions attached to the offer, but they are not relevant to this discussion, and they only enhanced IDC Bellingham's position.

garden apartments on developer's leasing five apartments to town's low income housing program). Considerations that are unrelated to the impacts of a proposed development are "extraneous" and may not provide the basis needed to justify an exercise of the police power. *Sylvania Elec. Prods. Inc.* v. *Newton, supra* at 434. Where extraneous considerations are shown to be the basis for an exercise of the police power, the operational vote may be "impeach[ed]." *Id.* Here, IDC's offer was unrelated to any aspect of the proposed development or any public need arising out of the zoning change, and therefore was not a legitimate basis for the vote.

Although the parties do not raise the issue of standing, this court can raise the issue on its own because it goes to subject matter jurisdiction. See *Prudential-Bache Secs., Inc.* v. *Commissioner of Revenue*, 412 Mass. 243, 248 (1992). The plaintiffs claim no injury peculiar to them. They have withdrawn their claim that the rezoning must be declared invalid as spot zoning that has adversely affected their land. See *Whittemore* v. *Building Inspector of Falmouth*, 313 Mass. 248 (1943). Because the plaintiffs are not a party to the contract and because they are not authorized to bring this litigation in the name of the town, they have no standing to maintain this action. Illegal contract zoning does not create a distinct cause of action in persons not a party to the contract. Absent a statute authorizing the plaintiffs to bring suit to challenge the vote of the town meeting (without a showing of harm), the defendants are entitled to summary judgment on counts II and III. Sadly, these circumstances demonstrate government and private interests at their shameful worst, and are most likely to involve the most needy towns.