JENNIFER DiRico & others[1] *vs.* TOWN OF KINGSTON & others.[2]

Suffolk. May 4, 2010. - September 21, 2010.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Zoning,* Amendment of by-law or ordinance, Validity of by-law or ordinance. *Department of Housing and Community Development. Municipal Corporations,* Town meeting, Police power. *Words,* "Smart growth."

A Land Court judge properly allowed the defendants' motion for summary judgment, dismissing the plaintiffs' challenge, pursuant to G. L. c. 240, § 14A, to the validity of the defendant town's (town) zoning bylaw amendment adopting, pursuant to G. L. c. 40R, an overlay "smart growth zoning district," for which the Department of Housing and Community Development (department) had issued a letter of eligibility, where, despite the town's incorrect calculation of the amount of developable land and failure to notify the department of the revised calculation (as it was obligated to do), the omissions were not a basis to invalidate the zoning amendment itself. [95-99]

CIVIL ACTION commenced in the Land Court Department on November 14, 2007.

The case was heard by *Karyn F. Scheier,* J., on a motion for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*David H. Abbott* (*Andrew D. Berman* with him) for the plaintiffs.

*Jason R. Talerman* for town of Kingston & another.

*Howard G. Guggenheim,* for Thorndike Development Corporation & others, was present but did not argue.

IRELAND, J. We transferred this case here on our own motion

---

[1] Helen K. Gavin, and Mildred M. Leonardi.

[2] Mary O'Donnell and Robert Moakley, trustees of the O'Donnell Family Realty Trust; and Thorndike Development Corporation. Prior to the summary judgment proceedings that are the subject of this appeal, a Land Court judge dismissed the complaint against the building inspector and zoning enforcement officer.

to determine the validity of an amendment to the defendant town of Kingston's (town's) zoning bylaw that created a "smart growth" zoning overlay district (zoning amendment) pursuant to G. L. c. 40R and its enabling regulations, 760 Code Mass. Regs. §§ 59.00 (2005). The plaintiffs, who own and reside on land abutting or near the smart growth zoning district,[3] contend that the zoning amendment is an arbitrary or unreasonable exercise of the town meeting's zoning power because the town "failed to analyze and consider adequately relevant land use planning considerations." The plaintiffs focus on a decrease in the amount of developable land comprising the smart growth zoning district on account of a change in designation of a portion of that land as a "priority habitat" (see note 11, *infra*) for rare species protected under the Massachusetts Endangered Species Act (MESA), G. L. c. 131A, and its implementing regulations, 321 Code Mass. Regs. §§ 10.00 (2005). Although the town should have revised its figures concerning the amount of developable land comprising the smart growth zoning district, we conclude that its failure to do so did not invalidate the zoning amendment. We therefore affirm the Land Court judge's grant of summary judgment in favor of the defendants and the judgment dismissing the complaint.

1. *Statutory and regulatory framework.* In 2004, the Legislature enacted legislation entitled "Smart Growth Zoning and Housing Production," which is codified at G. L. c. 40R. See St. 2004, c. 149, § 92. The stated purpose of the statute is "to encourage smart growth and increased housing production in Massachusetts." G. L. c. 40R, § 1. The statute defines "[s]mart growth" as follows:

> "Smart growth is a principle of land development that emphasizes mixing land uses, increases the availability of affordable housing by creating a range of housing opportunities in neighborhoods, takes advantage of compact design, fosters distinctive and attractive communities, preserves open space, farmland, natural beauty and critical environmental areas, strengthens existing communities, provides a variety of transportation choices, makes develop-

---

[3]There is no issue of standing before us.

ment decisions predictable, fair and cost effective and encourages community and stakeholder collaboration in development decisions."

*Id.* The Legislature has designated the Department of Housing and Community Development (department) as the regulatory agency charged with administering smart growth development. *Id.* at § 12. The department has implemented regulations concerning the smart growth program and its operation. 760 Code Mass. Regs. §§ 59.00.

To effectuate smart growth, municipalities are authorized to create so-called "smart growth zoning districts" in "eligible location[s]."[4] G. L. c. 40R, § 3. A smart growth zoning district may be adopted by any city or town as part of its zoning ordinance or bylaw in accordance with the standards set forth in G. L. c. 40A, § 5 (setting forth procedure for adoption or amendment to municipal zoning ordinance or bylaw). G. L. c. 40R, § 3. The smart growth statute requires, among other mandates, that primary residential use be allowed "as of right" in a smart growth zoning district. *Id.* In addition, a municipality may permit "business, commercial or other uses consistent with primary residential use" in a smart growth zoning district. *Id.* A comprehensive list of the minimum requirements for a smart growth zoning district appears at G. L. c. 40R, § 6 (*a*).

It should be understood that a smart growth zoning district is an *overlay* district that is "superimposed over [one] or more zoning districts in an eligible location, within which a developer may elect to either develop a project in accordance with requirements of the smart growth zoning ordinance or by-law, or develop a project in accordance with requirements of the underlying zoning district." *Id.* at § 2. Projects developed in accordance with the requirements of a smart growth zoning ordinance or bylaw are to be governed solely by those provisions and "without any reference to the standards or procedures of the [u]nderlying [z]oning that would otherwise be applicable to developments

---

[4]The smart growth statute defines "[e]ligible locations" as "(1) areas near transit stations . . . ; (2) areas of concentrated development . . . ; or (3) areas that by virtue of their infrastructure, transportation access, existing underutilized facilities, and/or location make highly suitable locations for residential or mixed use smart growth zoning districts." G. L. c. 40R, § 2. See 760 Code Mass. Regs. § 59.04(1)(a) (2005).

within the same geographic area as the [d]istrict." 760 Code Mass. Regs. § 59.04(1)(l). "Without limitation," the smart growth zoning district ordinance or bylaw "shall set out the dimensional, use, parking, and other standards applicable to [p]rojects within the [smart growth zoning district] including but not limited to height limits, setbacks, lot areas, lot dimensions, unit to lot ratios, floor area ratios, lot coverage ratios, open space ratios, parking ratios, parking locations, and roadway design standards." *Id.* "Such provisions may change the dimensional and other standards contained in the [u]nderlying [z]oning in order to allow the densities, [a]ffordability,[5] mix of uses, and physical character of [p]rojects which are permitted [a]s-of-right . . . ." *Id.* The ordinance or bylaw "may allow the [a]pproving [a]uthority,[6] through the [p]lan [r]eview process, to waive specific dimensional and other standards (other than [a]ffordability requirements) otherwise applicable to a [p]roject." *Id.*

In providing for smart growth zoning, G. L. c. 40R and 760 Code Mass. Regs. § 59.05 set forth a detailed procedural framework for municipalities and the department to follow. As relevant here, a municipality must first hold a public hearing on whether the provisions of a smart growth zoning ordinance or bylaw shall be adopted by the municipality. 760 Code Mass. Regs. § 59.05 (1). Thereafter, a municipality submits its completed application to the department for a preliminary determination of eligibility. *Id.* at § 59.05 (2). The information in the application shall:

"(*a*) identify and describe the boundaries of the proposed smart growth zoning district;

"(*b*) identify and describe the developable land area within the proposed smart growth zoning district;

---

[5]One of the minimum requirements for a smart growth zoning district is that "not less than [twenty] per cent of the residential units constructed in projects of more than [twelve] units . . . be affordable, as defined in section [two]." G. L. c. 40R, § 6 (*a*) (4). See *id.* at § 2 (defining "[a]ffordable housing").

[6]An "[a]pproving authority" is "a unit of municipal government designated by the city or town to review projects and issue approvals [for smart growth development projects]." G. L. c. 40R, § 2. See 760 Code Mass. Regs. § 59.02 (2005).

"(*c*) identify and describe other residential development opportunities for infill housing and the residential re-use of existing buildings and underutilized buildings within already developed areas;

"(*d*) include a comprehensive housing plan, as set forth in section 8;

"(*e*) include a copy of the proposed smart growth district ordinance or by-law;

"(*f*) by narrative and exhibits, establish the elements set forth in section 6 [minimum requirements for smart growth zoning district]."

G. L. c. 40R, § 5. See 760 Code Mass. Regs. § 59.03.

Concerning the identification of the developable land area within the proposed smart growth zoning district, the smart growth statute defines "[d]evelopable land area" as "that area within an approved smart growth zoning district that can be feasibly developed into residential or mixed use development determined in accordance with regulations of the department." G. L. c. 40R, § 2. The statute goes on to specify what is excluded from developable land area. "Developable land area shall not include . . . land area that is already substantially developed [or] areas exceeding [one-half] acre of contiguous land that are unsuitable for development because of topographic features or for environmental reasons, such as wetlands." *Id.* Under the department's regulations, developable land area excludes "[s]ubstantially [d]eveloped [l]and"[7] and "areas exceeding

---

[7] "Substantially [d]eveloped [l]and" refers to "land within a [d]istrict that is currently used for commercial, industrial, institutional, or governmental use, or for residential use consistent with or exceeding the densities allowable under the [u]nderlying [z]oning, and which does not qualify as [u]nderutilized land. . . ." 760 Code Mass. Regs. § 59.02. "Underutilized [l]and" "means [d]evelopable [l]and within a [d]istrict that would otherwise qualify as [s]ubstantially [d]eveloped [l]and, but which contains land, buildings, and/or structures that are currently underutilized and may potentially be developed, recycled, or converted into residential or [m]ixed-use [d]evelopment. Part or all of a parcel of land shall be considered [u]nderutilized if it is no longer necessary to support the current use, based on factors including but not limited to current and projected employment levels, vacancy rates, and parking demand." *Id.*

[one-half] acre of contiguous land that are . . . rare species habitat designated under [F]ederal or [S]tate law." 760 Code Mass. Regs. § 59.02. The component of developable land area is significant in determining the minimum as-of-right density requirements (housing units) in a smart growth zoning district, see *id.* at § 59.04(1)(d),[8] and correspondingly, the amount of certain financial incentives awarded to stimulate smart growth. See G. L. c. 40R, § 9; 760 Code Mass. Regs. § 59.06.[9]

On receipt of a municipality's complete application to create a smart growth zoning district, the department "shall make a preliminary determination, before the [m]unicipality votes on its

[8]The smart growth zoning ordinance or bylaw "shall provide for any one or more of the following minimum allowable [a]s-of-right density requirements, as applicable . . .

> "1. allowing a density of at least eight units per acre for [d]evelopable [l]and zoned for single-family residential use;
>
> "2. allowing a density of at least [twelve] units per acre for [d]evelopable [l]and zoned for two-and/or three-family residential use; or
>
> "3. allowing a density of at least [twenty] units per acre for [d]evelopable [l]and zoned for multi-family residential use."

760 Code Mass. Regs. § 59.04(1)(d). The zoning may provide for different subdistricts within the smart growth zoning district, with different allowable uses and densities in each subdistrict, so long as each subdistrict satisfies the minimum allowable residential density requirements. See *id.*

[9]To encourage smart growth development, the Legislature has established three types of financial incentives for municipalities creating smart growth zoning districts in accordance with statutory and regulatory requirements. See G. L. c. 40R, § 9. The incentives are tied to meeting certain procedural benchmarks. "Within [ten] days of confirmation of approval by the department" that a municipality has adopted an eligible smart growth zoning district, the municipality receives a one-time "zoning incentive payment" that correlates with the number of units of new construction allowed in the smart growth zoning district and "consistent with the [municipality's] comprehensive housing plan." *Id.* at § 9 (*a*). In addition, municipalities are eligible for a "density bonus payment" in the amount of $3,000 for each housing unit of new construction that is created in the smart growth zoning district, payable within ten days of submission of proof that a building permit for the unit has issued. *Id.* at § 9 (*b*). The last incentive requires that the Executive Office of Environmental Affairs, the Executive Office of Transportation, the Department of Administration and Finance, and the department, when awarding funds, use a discretionary funding methodology that "favors" municipalities having approved smart growth zoning districts. *Id.* at § 9 (*c*). See 760 Code Mass. Regs. § 59.06.

proposed [s]mart [g]rowth [z]oning, whether the application satisfies the approval requirements set forth in [760 Code Mass. Regs. § 59.04 (1), concerning mandatory requirements for smart growth zoning]." *Id.* at § 59.05 (2). See G. L. c. 40R, § 4 (*a*). The department may approve an application, issuing a "[l]etter of [e]ligibility," with or without conditions, or may deny it. 760 Code Mass. Regs. § 59.05 (2)(c). See G. L. c. 40R, § 4 (*a*).

Once a municipality obtains a letter of eligibility from the department, it may vote on the proposed zoning ordinance or bylaw set forth in its application. 760 Code Mass. Regs. § 59.05 (3). A municipality "shall make any changes to its [smart growth zoning ordinance or bylaw] and other elements of the application as may have been required by the [d]epartment." *Id.* The zoning adoption process is the same as under G. L. c. 40A, with the exception that "the local vote [must] occur[] within three years of the date of the [l]etter of [e]ligibility," 760 Code Mass. Regs. § 59.05 (3). See G. L. c. 40R, § 3.

Following the local adoption of a zoning ordinance or bylaw for a smart growth zoning district, a municipality must apply to the department for final approval of the smart growth zoning ordinance or bylaw. G. L. c. 40R, § 4 (*b*). The municipality "shall submit to the [d]epartment proof of such adoption [of the smart growth zoning ordinance or bylaw]." 760 Code Mass. Regs. § 59.05(4). If the department has required any amendments to the smart growth zoning ordinance or bylaw, the municipality's application, or "any other related matter," the municipality's submission "shall confirm that such amendment(s) have been made and incorporated." *Id.* In addition, if there has been any other change to the smart growth zoning ordinance or bylaw, or to "any other element of the original application, other than changes that the [d]epartment has required in a conditional [l]etter of [e]ligibility, then the [d]epartment may treat the submission as an amendment to the application, and it shall notify the [m]unicipality of its decision to do so in writing." *Id.* "In such event the [d]epartment shall confirm its final approval within [sixty] days of receipt of the submission, provided that the amended application satisfies all of the approval criteria set forth in 760 [Code Mass. Regs. §] 59.04(1)." 760 Code Mass. Regs. § 59.05(4). Once a municipality has received final

approval from the department, it becomes eligible to receive the zoning incentive payment [see note 9, *supra*] and the letter of approval "shall specify . . . the number of [i]ncentive [u]nits and the amount of the [z]oning [i]ncentive [p]ayment that shall be made." *Id.* at § 59.05(4).

The department's oversight does not end with the issuance of its final approval. Every municipality with an approved smart growth zoning district (or which has filed an application for a proposed smart growth zoning district within the fiscal year) must furnish an annual update, on or before July 31 of each year, to the department. *Id.* at § 59.07(1). The annual update "shall contain," among other requirements, "[a] list of all [a]pproved and currently proposed [smart growth zoning districts] within the [m]unicipality, with a tabulation for each [smart growth zoning district] of the total land area, the [d]evelopable [l]and area and the [s]ubstantially [d]eveloped [l]and area, the number of [i]ncentive [u]nits, and the amount of [d]evelopable and [s]ubstantially [d]eveloped [l]and zoned at various allowable [a]s-of-right residential densities under the [smart growth zoning ordinance or bylaw]." *Id.* at § 59.07(1)(a).

"On or before October 1 of each year after the year of approval of a [smart growth zoning] district by the department, the department shall send a smart growth zoning district certificate of compliance to each city or town with an approved district." G. L. c. 40R, § 7 (*a*). To receive the certificate, a municipality "shall verify within the time specified by the department: (1) that the city or town has adopted an approved smart growth zoning district; (2) that the certification has not been revoked by the department; (3) that the district is being developed in a manner that reasonably complies with the minimum requirements set forth in section 6 for housing density and affordability; [and] (4) that the approving authority has not unreasonably denied plans for projects . . . ." *Id.* A municipality also must timely submit its annual update. 760 Code Mass. Regs. § 59.07(3). If the department is unable to certify compliance, it shall issue a letter of noncompliance, giving a municipality sixty days to submit proof of compliance or the commencement of remedial measures. *Id.* If this showing is not satisfactory, the department "shall hold a public hearing subject to chapter 30A . . . and may revoke certification."

G. L. c. 40R, § 7 (*b*). See 760 Code Mass. Regs. § 59.07(3). "Any revocation of certification or other sanctions imposed by the department shall not affect the validity of the smart growth zoning ordinance or by-law, or the application of such ordinance or by-law to land, development or proposed development within the smart growth zoning district." G. L. c. 40R, § 7. See 760 Code Mass. Regs. § 59.07(3). Such action, however, may trigger the suspension of financial incentives to a municipality or the municipality's repayment of financial incentives to the department. 760 Code Mass. Regs. § 59.06(3)(c) and (d).

The department is required to file annual reports to the Legislature, "[n]o later than November 15th of each year." 760 Code Mass. Regs. § 59.07(4). See G. L. c. 40R, § 12. The report, among other mandates, must list the municipalities that have approved smart growth zoning districts or have submitted applications for such a district within the prior year. 760 Code Mass. Regs. § 59.07(4). The report also must set forth the aggregate size of all approved and proposed smart growth zoning districts, including specifying the aggregate total land area, developable land area, and substantially developed land area. *Id.* The department's report shall contain information concerning the zoning incentive and density bonus payments. *Id.* Reports are to be made "available to the general public." *Id.*

2. *Background.* The material undisputed facts are as follows. The town is a coastal community in southeastern Massachusetts that, in recent years, has experienced unprecedented development pressures. From 1980 to 2000, the town's population grew by sixty per cent, with the majority of development taking the form of single-family residential homes on large lots. In February, 2006, the town was approached by the defendant Thorndike Development Corporation (Thorndike), about the possibility of adopting a zoning amendment that would create a smart growth zoning district on property located less than one-half mile from the Kingston commuter rail station (property). The property consists of 109 acres and includes an excavated sand pit. Thorndike had acquired an option to purchase the property from its owners, the defendants Mary O'Donnell and Robert Moakley, trustees of the O'Donnell Family Realty Trust, and was interested in developing a smart growth development to be

called 1021 Kingston's Place (Kingston's Place). Kingston's
Place would consist of up to 730 new residential units, 50,000
square feet of retail space, and 250,000 square feet of com-
mercial space.

In February, 2006, the town requested and received a pre-
liminary determination from the department that the property
would be in an "eligible location" for smart growth development.
In June, 2006, the town submitted its application to the depart-
ment for its proposed smart growth project. Included in the
town's application, as required, was a certification of the amount
of developable land in the proposed smart growth zoning dis-
trict. Specifically, the town's application certified that the
proposed smart growth zoning district consisted of 109 acres, of
which 69.6 acres (or 63.9 per cent of the district) consisted of
developable land. The application also identified that the
proposed district included 11.2 acres (or 10.3 per cent) of en-
vironmentally constrained land, none of which, at the time,
included rare species habitat designated under State or Federal
law.

Effective October 1, 2006, the Natural Heritage and Endan-
gered Species Program,[10] issued the twelfth edition of its Natural
Heritage Atlas (atlas). Pursuant to the atlas, a substantial portion
of the land comprising the proposed Kingston's Place develop-
ment, possibly as much as fifty per cent, was designated as a
priority habitat of State-listed rare species (including the eastern
box turtle)[11] and an estimated habitat of rare wildlife.[12]

The town became aware of the atlas designations in November

---

[10]The Natural Heritage and Endangered Species Program is "the program
within the Division of Fisheries and Wildlife responsible for the inventory,
research, and protection of rare plant and animal species and the maintenance
of computerized and manual records of rare species locality information." 321
Code Mass. Regs. § 10.02 (2005).

[11]A "[p]riority [h]abitat" is "the geographic extent of [h]abitat for State-
listed [s]pecies as delineated by the [division of fisheries and wildlife] pursu-
ant to [321 Code Mass. Regs. § 10.12 (2005)]." 321 Code Mass. Regs. § 10.02
(2005). Priority habitats "are delineated based on records of State-listed [s]pe-
cies observed within the [twenty-five] years prior to delineation and contained
in the [d]ivisions's [Natural Heritage and Endangered Species Program's]
database." *Id.* "State-listed [s]pecies" refers to "any species on the [S]tate list."
*Id.* The "State-list" "means the Massachusetts list of [e]ndangered, [t]hreatened,
and [s]pecial [c]oncern species found at [321 Code Mass. Regs. § 10.90
(2008)]." 321 Code Mass. Regs. § 10.02. Generally, the term "[h]abitat" is

of 2006. Subsequently, the town did not revise its figures contained in its application to the department concerning the developable land area, environmentally constrained land, or total future zoned incentive units in the proposed smart growth zoning district.

On April 4, 2007, the department issued a letter of eligibility to the town, approving the town's application for the creation of the smart growth zoning district and the underlying zoning amendment, with certain conditions. As relevant here, as part of one of the conditions, the department required annual updates to be filed with the department "[o]n or before July 31 of each year . . . containing . . . a table indicating the total land area, the [d]evelopable [l]and [a]rea, the [s]ubstantially [d]eveloped [l]and [a]rea, the number of [i]ncentive [u]nits, the amount of [d]evelopable and [s]ubstantially [d]eveloped [l]and zoned for each type of residential use allowed under the [smart growth zoning ordinance or bylaw] for the [smart growth zoning district]."

On April 11, 2007, the zoning amendment was adopted by a vote of the Kingston town meeting. The department granted its final approval of the zoning amendment on August 28, 2007. The town received a zoning incentive payment in the amount of $600,000. In its first annual update to the department, dated July 30, 2008, the town did not revise its figures relating to the developable land area, environmentally constrained land, or total future zoned incentive units.[13]

---

defined as "an area which, due to its physical or biological features, protects or provides important elements for the growth and survival of plants or animals such as food, shelter, or living space, and includes without limitation, breeding, feeding, resting, migratory, or overwintering areas. Physical or biological features include, but are not limited to: structure and composition of the vegetation; faunal community; soils; water chemistry and quality; and geologic, hydrologic, and microclimatic factors." *Id.*

[12]According to the plaintiffs' expert, a certified professional wetland scientist and consultant, "[e]stimated [h]abitats" under the Wetlands Protection Act, G. L. c. 131, § 40, and its implementing regulations, 310 Code Mass. Regs. § 10.59 (2005), "are a subset of [p]riority [h]abitats that does not include those areas delineated for rare plants or for rare wildlife with strictly upland habitat requirements. Estimated [h]abitats are based on documented occurrences of rare wetlands wildlife observed within the last [twenty-five] years."

[13]The summary judgment materials containing this information were filed in December, 2008. The record does not contain any information concerning the content of later annual updates. We do not examine materials that were not before the motion judge.

On November 14, 2007, the plaintiffs filed their original complaint in the Land Court seeking, pursuant to G. L. c. 240, § 14A,[14] to have the zoning amendment invalidated. After various proceedings, the remaining defendants (see note 2, *supra*) moved for summary judgment on count three of the complaint (the only remaining count), which alleges that the zoning amendment is invalid as an arbitrary and unreasonable exercise of zoning power because the town "failed to analyze and consider adequately relevant land use planning considerations." Specifically, as relevant to this appeal,[15] the plaintiffs claimed that the town failed adequately to consider, and should have informed the department of, the effect of the change in the priority habitat designation to the calculation of developable land for the proposed Kingston's Place development.

In her summary judgment decision, the Land Court judge acknowledged that the town's calculation of the amount of developable land, for summary judgment purposes, was incorrect at the time the department issued its letter of eligibility on April 4, 2007, and when the zoning amendment was adopted by the town meeting on April 11, 2007 (because the atlas containing the priority habitat designation became effective on October 1, 2006). She concluded, however, that the error did not invalidate the zoning amendment. The judge explained that the town's duty to submit its first annual update had not yet arisen when

[14]General Laws c. 240, § 14A, authorizes "[t]he owner of a freehold estate in possession in land [to] bring a petition in the land court against a city or town wherein such land is situated . . . for determination as to the validity of a municipal ordinance, by-law or regulation, passed or adopted under the provisions of chapter forty A . . . which purports to restrict or limit the present or future use, enjoyment, improvement or development of such land . . . or for determination of the extent to which any such municipal ordinance, by-law or regulation affects a proposed use, enjoyment, improvement or development of such land . . . ."

[15]In their complaint, the plaintiffs averred that the town "failed to analyze and consider adequately relevant land use planning considerations including, but not limited to, traffic impacts, the character of the neighborhood, the prevention of blight and pollution of the environment, and the encouragement of the most appropriate use of land throughout the town." The defendants challenged this claim in their summary judgment motion, and based on the voluminous summary judgment record, the Land Court judge agreed with the defendants that the plaintiffs could not sustain their burden of proof on the claim. The plaintiffs do not appeal from this aspect of her decision.

the zoning amendment was adopted by the town, and that thereafter, the motives of the town for failing to update the developable land component of its application, could not be considered by the court. In addition, she did not otherwise find a duty imposed by the smart growth statute or regulations on the town to supplement its application on learning of the rare species priority habitat designation. The judge pointed out that the department's approval is not "the final step for Thorndike in completing its proposed development," and that "many permits [are] still required before Thorndike can begin its project, including permitting processes through which the specific question of impact on endangered species will be vetted." For these reasons, the judge concluded that the plaintiffs had not and could not meet their burden of proving facts that compel a conclusion that the validity of the zoning amendment "is not even fairly debatable," *Crall* v. *Leominster*, 362 Mass. 95, 103 (1972). The judge granted the defendants' motion for summary judgment and entered a judgment dismissing the plaintiffs' complaint.

3. *Discussion.* Smart growth zoning districts must be adopted in accordance with G. L. c. 40A, § 5. G. L. c. 40R, § 3. Whether a smart growth zoning ordinance or bylaw is valid accordingly rests on the settled principles that pertain to zoning ordinances or bylaws enacted under G. L. c. 40A. Under these standards, "[t]he enactment of a zoning bylaw by the voters at town meeting is not only the exercise of an independent police power, it is also a legislative act." *Durand* v. *IDC Bellingham, LLC*, 440 Mass. 45, 50 (2003) (*Durand*). See *Opinion of the Justices*, 358 Mass. 838, 840 (1971). Consequently, a strong presumption of validity is to be afforded to the challenged bylaw or ordinance. *Durand, supra* at 51. The presumption "will not normally be undone unless the plaintiff can demonstrate 'by a preponderance of the evidence that the zoning regulation is arbitrary and unreasonable, or substantially unrelated to the public health, safety . . . or general welfare.' " *Id.*, quoting *Johnson* v. *Edgartown*, 425 Mass. 117, 121 (1997). "If the reasonableness of a zoning bylaw is even 'fairly debatable, the judgment of the local legislative body responsible for the enactment must be sustained.' " *Durand, supra*, quoting *Crall* v. *Leominster, supra* at 101. "Such an analysis is not affected by consideration of the

various possible motives that may have inspired legislative action." *Durand, supra,* and cases cited.

As an initial matter, the term "developable land" expressly excludes "areas exceeding [one-half] acre of contiguous land that are . . . rare species habitat designated under [F]ederal or [S]tate law." 760 Code Mass. Regs. § 59.02. Although a developer may challenge a priority habitat designation under State law, see 321 Code Mass. Regs. § 10.25 (2005), that process has no bearing on the definition of the term "developable land" under the smart growth zoning statute. Thus, for summary judgment purposes, the effect of the atlas designation in this case was significantly to decrease the amount of developable land comprising the proposed smart growth zoning district.

There is no question that the duty of a municipality to identify correctly the amount of developable land in a proposed smart growth zoning district takes on great significance under the statutory and regulatory scheme. As has been mentioned, this component affects the permissible density of a smart growth project, as well as the amount of financial incentives to be given a municipality from State funds. Consequently, throughout the lengthy process to create a smart growth zoning district, information concerning the amount of developable land in a proposed or approved smart growth zoning district, when required, should be, to the best of a municipality's ability, current and correct as of the date of a submission. To conclude otherwise, would render the various statutory and regulatory obligations after the submission of the original application superfluous. We also note the absence of any express requirement to use the figure (concerning the amount of developable land) set forth in the original application in submissions following the original application.

When originally submitted on June, 2006, the town's application, regarding the amount of developable land in the proposed smart growth zoning district, was accurate. Like the Land Court judge, we find no statutory or regulatory mandate imposed on the town to revise its application (concerning the amount of developable land) *prior to* the department's issuance of a letter of eligibility under 760 Code Mass. Regs. § 59.05(2)(c). The same, however, cannot be said of the town's obligations in con-

nection with seeking final approval for the smart growth zoning district from the department. Pursuant to 760 Code Mass. Regs. § 59.05(4), after a municipality has adopted a smart growth zoning ordinance or bylaw, it is required to notify the department of "all differences between the proposed [smart growth zoning ordinance or bylaw] and the [smart growth zoning ordinance or bylaw] as adopted locally." In addition, a municipality "shall identify" in its submission, "any other changes to the original application." *Id.* These identification obligations allow the department, if it chooses, to "treat the submission as an amendment to the application," which must satisfy "all of the approval criteria set forth in [760 Code Mass. Regs. § 59.04(1) (pertaining to mandatory requirements for smart growth zoning district)]." 760 Code Mass. Regs. § 59.05(4). We agree with the plaintiffs that this broad regulatory mandate obligated the town to revise its figures concerning the project's developable land area in its submission seeking the department's final approval of its smart growth zoning district. The fact that the town did not on its own cause the figure concerning the amount of developable land to be altered does not matter. When the town learned of an event (the atlas designation) that rendered information in its original application (concerning the amount of developable land) incorrect, a change was necessitated and the town, as the applicant, was obligated to bring that change to the department's attention in its submission seeking the department's final approval. Should the change to the original application be insignificant, the department retains the discretion to go forward and need not treat every change as an amendment. However, that determination is one for the department, and not for the town, to make.

We also agree with the plaintiffs and the Land Court judge that the town, in its annual updates, is obligated to set forth the current figures concerning the amount of developable land in the smart growth zoning district. See 760 Code Mass. Regs. § 59.07(1)(a) (municipality with smart growth zoning district "shall file" annual update with department by July 31 each year that "shall contain . . . the [d]evelopable [l]and area"). Moreover, although the town's obligation to file its first *regulatory* annual update arose after the department's final approval

on August 28, 2007, of the smart growth zoning district, in its April 4, 2007, letter of eligibility, the department specifically required as one of its conditions that the town file annual updates "[o]n or before July 31 of each year . . . containing . . . a table indicating . . . the [d]evelopable [l]and [a]rea . . . ." This condition imposed the duty on the town to file an annual update on or before July 31 of 2007 that contained correct figures *as of that date* concerning the amount of developable land. Current figures on the developable land area were necessary because duplication of the figures contained in the original application would serve no purpose. For example, inaccurate figures would not assist the department in determining the proper density and corresponding amount of financial incentives to be awarded to the town.

Although we conclude that the town failed to revise its figures concerning the developable land area in accordance with the duties discussed above, we conclude that these omissions are not a basis to invalidate the zoning amendment itself. As relevant to the development of Kingston's Place, the amount of developable land bears on the number of units to be developed and the amount of financial incentives to be paid to the town. When a smart growth project is not being "developed in a manner that reasonably complies with the minimum requirements set forth . . . for housing density and affordability," G. L. c. 40R, § 7 (*a*) (3), because a decrease in the amount of developable land has rendered the density and affordability figures inaccurate, or a town fails to submit its regulatory annual updates, see 760 Code Mass. Regs. § 59.07(3), the department may seek, as recourse, to revoke its certification of the smart growth zoning district. G. L. c. 40R, § 7 (*b*). See 760 Code Mass. Regs. § 59.07(3). Significantly, a certificate of revocation "shall not affect the validity of the smart growth zoning ordinance or by-law." G. L. c. 40R, § 7 (*b*). See 760 Code Mass. Regs. § 59.07(3). Thus, the town's omissions do not invalidate the zoning amendment. Rather, the consequence is one of a financial nature, triggering the suspension or repayment of financial incentives awarded to a municipality. See 760 Code Mass. Regs. § 59.06(3)(c) and (d).

Our conclusion does not undermine the purpose of G. L.

c. 40R to "preserve[] . . . critical environmental areas," G. L. c. 40R, § 1. The zoning amendment creates a smart growth zoning bylaw authorizing a smart growth zoning district in the town. The record demonstrates that the town faced unprecedented development and had a pressing need for additional housing. Thus, the zoning amendment, regardless of how the exact development turns out, served a valid public purpose as well as one of the purposes of the smart growth zoning statute — to create additional housing. The plaintiffs seem to overlook that the zoning amendment is just one component in a lengthy application and approval process. Significantly, the zoning amendment does not function as a permit to develop the land, as relevant here, in derogation of MESA or the Wetlands Protection Act, G. L. c. 131, § 40. As noted by the town, a designation of land as a priority habitat for rare species does not preclude development. To the contrary, the priority habitat designation change serves to impose an additional layer of permitting on the ultimate development in the smart growth zoning district. See 321 Code Mass. Regs. §§ 10.18-10.23 (2005). Specifically, Thorndike will need to apply for a conservation and management permit to build in the designated area and satisfy the requirements of 321 Code Mass. Regs. § 10.23, which are designed to protect the impacted State-listed species.

For these reasons, we agree with the Land Court judge's determinations that the plaintiffs have not proved "facts which compel a conclusion that the question [of the validity of the zoning amendment] is not even fairly debatable," *Crall* v. *Leominster*, 362 Mass. 95, 103 (1972), and that the zoning amendment is valid. The judge was correct to grant summary judgment to the defendants and to direct entry of a judgment dismissing the complaint.

*Judgment affirmed.*